United States District Court
Southern District of Texas
**ENTERED**
August 14, 2026
Nathan Ochsner, Clerk

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| JEWELL THOMAS, | § | |
| | § | |
| Plaintiff, | § | |
| v. | § | CIVIL ACTION NO. 2:23-CV-00190 |
| | § | |
| WARDEN ELBERT HOLMES, *et al.*, | § | |
| | § | |
| Defendants. | § | |

**MEMORANDUM ORDER AND OPINION ON PENDING MOTIONS**

Plaintiff Jewell Thomas, an inmate appearing *pro se*, has filed this prisoner civil rights action pursuant to 42 U.S.C. § 1983. He has paid the $402.00 filing fee. Pending before the Court are the following:

- a Motion for Summary Judgment filed by Adrian Amonett, Bryan Collier, Elbert Holmes, Dr. Isaac Kwarteng, Larissa Wysocki, Bobby Lumpkin, Jerry Sanchez, and the State of Texas, (D.E. 84);
- Plaintiff's Motion for Summary Judgment. (D.E. 93);
- Plaintiff's renewed motion for a temporary restraining order ("TRO") or other preliminary injunctive relief, (D.E. 106)[1]; and
- Plaintiff's Motion to Vacate Notice of Appeal to the Fifth Circuit, (D.E. 110).[2]

[1] On July 6, 2026, the Court denied Plaintiff's Second Motion for Emergency Injunctive Relief, construed as seeking a TRO. (D.E. 104). One week later, the Court received Plaintiff's renewed motion seeking a TRO or other preliminary injunctive relief. (D.E.106).

[2] Plaintiff's motion to vacate concerns his July 13, 2026, filing which was originally docketed as a notice of appeal to the Fifth Circuit, (D.E. 105), but which the Court has since recharacterized as a motion seeking the district court's ruling on the pending summary judgment motions. (D.E. 108).

The referral of these motions to Magistrate Judge Julie K. Hampton is **TERMINATED.**[3] For the reasons stated herein, the Court: (1) **GRANTS** Defendants' Motion for Summary Judgment in its entirety, (D.E. 84); (2) **DENIES** Plaintiff's Motion for Summary Judgment in its entirety, (D.E. 93); (3) **DENIES as moot** Plaintiff's renewed motion for preliminary injunctive relief, (D.E. 106); and **DENIES as moot** Plaintiff's motion to vacate notice of appeal, (D.E. 110).

## I. Jurisdiction

The Court has federal question jurisdiction over this civil action pursuant to 28 U.S.C. § 1331.

## II. Background

### A. Procedural Background

Plaintiff is a prisoner in the Texas Department of Criminal Justice, Correctional Institutions Division (TDCJ-CID) and is currently housed at the McConnell Unit in Beeville, Texas. Plaintiff's allegations in this case arise in connection with his former housing assignment. Plaintiff claims that the defendants violated his Eighth Amendment rights, his rights under the Americans with Disabilities Act (ADA), 42 U.S.C. §§ 12101–12189, and his rights under the Rehabilitation Act (RA), 29 U.S.C. §§ 701-797. (D.E. 1, p. 5); (D.E. 1-1, p. 3–19). Plaintiff broadly alleges he was subjected to excessively hot living conditions at his former housing assignment and denied appropriate medical care in connection with the excessive heat conditions. *Id.*

[3] This case was initially referred to Magistrate Judge Mitchel Neurock for case management. On November 18, 2025, this case and all pending motions/case management matters were referred to Magistrate Judge Hampton. (D.E. 96).

On August 14, 2023, the Court received Plaintiff's Amended Complaint in which he reasserted his claims under the Eighth Amendment, the ADA, and the RA. (D.E. 5, p. 8–20). Plaintiff named fourteen defendants in his Amended Complaint:

- Elbert Holmes, a former McConnell Unit warden ("Warden Holmes");
- Jerry Sanchez, another former McConnell Unit warden ("Warden Sanchez");
- Placido Samaniego, an assistant warden at the McConnell Unit ("Assistant Warden Samaniego");
- James Tanner, unit major at the McConnell Unit ("Major Tanner");
- Adan Cavazos, unit lieutenant at the McConnell Unit ("Lieutenant Cavazos");
- Alexis Jimenez, unit sergeant at the McConnell Unit ("Sergeant Jimenez");
- Adriana Gonzalez-Diaz, unit sergeant at the McConnell Unit ("Sergeant Gonzalez-Diaz");
- Jessy Perez, unit sergeant at the McConnell Unit ("Sergeant Perez");
- Dr. Isaac Kwarteng, medical director at the McConnell Unit ("Dr. Kwarteng");
- Bobby Lumpkin, former TDCJ-CID Director ("Director Lumpkin");
- Bryan Collier, TDCJ Executive Director ("Executive Director Collier");
- the State of Texas;
- John Doe, the current McConnell Unit ("Warden John Doe"); and
- Candice Flannin, a deputy warden at the McConnell Unit ("Deputy Warden Flannin").

*Id.* at 6–7.

Following the filing of his Amended Complaint, the Magistrate Judge issued an order directing Plaintiff to respond to a questionnaire containing 22 questions. (D.E. 9). Plaintiff filed a More Definite Statement containing his responses to the questions posed by the Court. (D.E. 10).

The Magistrate Judge then issued an order on March 15, 2024, which granted the following motions:

- Plaintiff's motion to amend his responses to Questions 13 and 14 (D.E. 11);
- Plaintiff's motion to amend his Amended Complaint by:
  - dismissing Major Tanner from this case;
  - adding Dr. Gary Morton, a physician employed at the McConnell Unit ("Dr. Morton") as a party defendant;
  - substituting former Warden Adrian Amonett ("Warden Amonett") in place of the "Warden John Doe" defendant; and
  - changing Warden Flannin's last name to "Flannel" (hereinafter "Deputy Warden Flannel").

(D.E. 15). With these changes, Plaintiff sued the following 14 Defendants: Warden Holmes; Warden Sanchez; Assistant Warden Samaniego; Lieutenant Cavazos; Sergeant Jimenez; Sergeant Gonzalez-Diaz; Sergeant Perez; Dr. Kwarteng; Dr. Morton; Director Lumpkin; Executive Director Collier; the State of Texas; Warden Amonett; and Deputy Warden Flannel.

Plaintiff seeks monetary relief consisting of $500,000 in compensatory damages and unspecified punitive damages. (D.E. 6, p. 4). Implicit in his Amended Complaint and response to the Questionnaire are requests for injunctive relief in the form of access to the full respite program, which includes unlimited access to an air-conditioned environment upon request without being placed in a 3 x 3-foot holding cell. *See* (D.E. 6); (D.E. 10).

**B. Screening and Dismissal of Several Defendants**

The Court retained the following claims after screening this action:

- Plaintiff's Eighth Amendment deliberate indifference claim of supervisory liability against Warden Holmes in his individual capacity for putting into place and enforcing policies limiting wellness checks, providing inadequate space for inmates like Plaintiff requesting air-conditioned respite, inadequately staffing a sufficient

number of escorts for Plaintiff to access respite upon request, and placing G5 inmates in an overly restrictive location (3 x 3-foot holding cell) for respite;

- Plaintiff's Eighth Amendment deliberate indifference claims of supervisory liability against Warden Sanchez in his individual capacity for putting into place or continuing policies limiting wellness checks, providing inadequate space for inmates like Plaintiff requesting air-conditioned respite, inadequately staffing a sufficient number of escorts for Plaintiff to access respite upon request; placing G5 inmates in a restrictive location (3 x 3-foot holding cell) for respite, and denying respite for G5 inmates like Plaintiff altogether from April 2022 through August 2022;

- Plaintiff's Eighth Amendment deliberate indifference claim of supervisory liability against Warden Amonett in his individual capacity for putting into place or continuing policies limiting wellness checks, providing inadequate space for inmates like Plaintiff requesting air-conditioned respite, inadequately staffing a sufficient number of escorts for Plaintiff to access respite upon request, placing inmates in a restrictive location (3 x 3-foot holding cell) for respite, and denying G5 inmates like Plaintiff the ability to access respite;

- Plaintiff's Eighth Amendment deliberate indifference claim against Dr. Kwarteng in his individual capacity based on his awareness of Plaintiff's heat-related medical issues from June 2022 through August 2022 and failure to attend to Plaintiff's medical needs; and

- Plaintiff's failure-to-accommodate ADA and RA claims (access to "full-respite" program including unlimited access to an air-conditioned environment) against the State of Texas and against Warden Holmes, Warden Sanchez, Warden Amonett, Deputy Warden Flannel, Assistant Warden Samaniego, Dr. Kwarteng, Sergeant Jimenez, Sergeant Perez, Sergeant Gonzalez-Diaz, Lieutenant Cavazos, Director Lumpkin, and Executive Director Collier in their official capacities for injunctive relief.

(D.E. 16, p. 71–72); (D.E. 46, p. 1–3).

As part of the screening process, the Court dismissed with prejudice many additional Eighth Amendment claims raised against several defendants. (D.E. 16, p. 73–74); (D.E. 46, p. 3–4). With regard to the last claim brought by Plaintiff, the Court dismissed without prejudice Plaintiff's Eighth Amendment claims of supervisory liability against Warden Holmes, Warden Sanchez, Warden Amonett, Deputy Warden Flannel, and Assistant Warden Samaniego in their

individual capacities based on their alleged failure to train or supervise staff.[4] (D.E. 16, p. 74); (D.E. 46, p. 4). The Court separately dismissed without prejudice for failure to serve Plaintiff's retained claims against Assistant Warden Samaniego, Sergeant Jimenez, Sergeant Perez, Sergeant Gonzalez-Diaz, Lieutenant Cavazos, and Deputy Warden Flannel. (D.E. 39, p. 3); (D.E. 47).

**C. Denial of Plaintiff's Motion for Emergency Injunctive Relief**

On September 25, 2024, the Court received Plaintiff's Motion for Emergency Injunctive Relief. (D.E. 50). Plaintiff claimed that prison staffers "continue to force the Plaintiff to sit inside of the 3x3 [foot holding cell] or no respite at all." (D.E. 50, p. 1). Liberally construed, Plaintiff asked that he be permitted to have respite from the heat in a larger space than the 3 x 3- foot holding cell—one in which he can elevate his leg and from which he can use the bathroom and return when needed. *Id.* at 2.

In a Memorandum and Recommendation ("M&R") issued on November 22, 2024, the Magistrate Judge recommended that Plaintiff's motion for preliminary injunctive relief be denied as moot because he had already received the requested injunctive relief. (D.E. 66, p. 6–8). The evidence presented demonstrated the following: (1) Plaintiff had been placed in an air-conditioned environment, in a normal-sized cell; and (2) if Plaintiff is moved back to a cell in a building not having air-conditioning, "he will have access to a large respite area (there is one in each building) in which he will be able to elevate his leg and will have access to a bathroom when needed." *Id.* at 7. Plaintiff did not file any objections. On December 30, 2024, the Court adopted the November 22, 2024 M&R and denied as moot Plaintiff's Motion for Emergency Injunctive Relief. (D.E. 73).

---

[4] The Court granted Plaintiff leave to amend the Amended Complaint only "with respect to presenting allegations detailing the respective duties and roles of Warden Holmes, Warden Sanchez, Warden Amonett, Warden Flannel, and Warden Samaniego in training and supervising subordinate staff during excessive heat conditions." (D.E. 46, p. 4). Plaintiff failed to submit amendments on this issue.

**D. Substitution of Parties and Summary Judgment Motions**

As noted above, the Court has retained ADA and RA claims against several Defendants in their official capacities, including Warden Amonett, Director Lumpkin, and Executive Director Collier. However, Warden Larissa Wysocki ("Warden Wysocki") recently replaced Warden Amonett as the McConnell Unit's senior warden. (D.E. 84, p. 7 n.1). Furthermore, Eric Guerrero ("Director Guerrero") has replaced Director Lumpkin and is the current TDCJ Director. *See Stocker v. TDCJ Staff*, No. 2:23-CV-00248, 2025 WL 2425197, at *1 n.1 (S.D. Tex. Jul. 24, 2025) (Ramos, J.). To further complicate matters, Director Lumpkin has recently replaced Executive Director Collier as TDCJ's current Executive Director. Pursuant to Federal Rule of Civil Procedure 25(d), the Court orders that:

- Warden Wysocky is **SUBSTITUTED** for Warden Amonett with respect to Plaintiff's ADA and RA claims asserted against this defendant in her official capacity;
- Director Guerrero is **SUBSTITUTED** for Director Lumpkin with respect to Plaintiff's ADA and RA claims asserted against this defendant in his official capacity; and
- Executive Director Lumpkin is **SUBSTITUTED** for Executive Director Collier with respect to Plaintiff's ADA and RA claims asserted against this defendant in his official capacity.

On April 25, 2025, Warden Amonett, Warden Larissa Wysocki ("Warden Wysocki"), Executive Director Collier, Warden Holmes, Dr. Kwarteng, Director Lumpkin, Jerry Sanchez, and the State of Texas filed a Motion for Summary Judgment. (D.E. 84). Given the party substitutions, the defendants properly joined in this summary judgment motion are:

- Warden Amonett in his individual capacity;
- Warden Holmes in his individual capacity;
- Jerry Sanchez, in his individual capacity;

- Dr. Kwarteng in his individual and official capacities;
- Warden Wysocki in her official capacity;
- Executive Director Lumpkin in his official capacity;
- Director Guerrero in his official capacity; and
- the State of Texas.

(collectively "Defendants"). Plaintiff has also filed a Motion for Summary Judgment. (D.E. 93). Defendants subsequently filed a reply in support of their summary judgment motion. (D.E. 94).

**III. Summary Judgment Evidence**

Defendants offer the following summary judgment evidence:

Ex. A: Expert Affidavit of Dr. Glenda Adams along with Plaintiff's relevant medical records, (D.E. 86);

Ex. B: Declaration of Warden Wysocki, (D.E. 84-1);

Ex. C: Declaration of Warden Amonett, (84-2);

Ex. D: Declaration of Warden Holmes, (D.E. 84-3);

Ex. E: Declaration of Warden Sanchez, (D.E. 84-4);

Ex. F. TDCJ Administrative Directive 10.64 ("AD-10.64"), (D.E. 84-5);

Ex. G. TDCJ officer pocket card, (D.E. 84-6);

Ex. H: TDCJ turnout training materials, (D.E. 84-7);

Ex. I: TDCJ officer pre-service training materials, (D.E. 84-8);

Ex. J: TDCJ supervisor pre-service training materials, (D.E. 84-9);

Ex. K: McConnell Unit training attendance logs, (D.E. 84-10).

Plaintiff's verified Amended Complaint, (D.E. 6), serves as competent summary judgment evidence based on his representation "under penalty of perjury" that his statements made in his

complaint and attachments were "true and correct." *Garrett v. Davis*, No. 2:14-CV-70, 2017 WL 1044969, at *3 (S.D. Tex. Mar. 20, 2017) (Ramos, J.) (collecting cases). Plaintiff's more definite statement, (D.E. 10), given under penalty of perjury, serves as competent summary judgment evidence too. *See Garrett*, 2017 WL 1044969, at *3. And, because Plaintiff further declared under penalty of perjury that the statements made in his Motion for Summary Judgment were "true and correct," (D.E. 93, p. 79), this submission also constitutes competent summary judgment evidence. *Hanson v. O'Daniel*, No. A-21-CV-629-RP, 2023 WL 5493607, at *2 n.5 (W.D. Tex. Aug. 23, 2023) (Pitman, J.) (collecting cases).

In addition, Plaintiff has submitted the following summary judgment evidence:

| | |
|---|---|
| Ex. A: | AD-10.64, (D.E. 93-1); |
| Ex. B: | Plaintiff's prescribed medications and Correctional Managed Health Care policy on heat stress, (D.E. 93-2); |
| Ex. C: | Defendants' Responses to Plaintiff's Discovery Requests, (D.E. 93-3); |
| Ex. D: | McConnell Unit's Senior Warden Employment History, (D.E. 93-4); |
| Ex. E: | Affidavits and Declarations submitted by Senior Wardens and Dr. Adams, (D.E. 93-5); |
| Ex. F: | Photographs of the Administrative Building Holding Cell, (D.E. 93-6); |
| Ex. G: | Photographs of 3 x 3-foot holding cell without special seating, (D.E. 93-7); |
| Ex. H: | Photographs of Legal Booth without special seating, (D.E. 93-8); |
| Ex. I: | McConnell Unit's Heat Restriction List, (D.E. 93-9); |
| Ex. J: | Heat and Humidity Index Chart/Graph, (D.E. 93-10); |
| Ex. K: | Plaintiff's Medical Records – Nurses Responses to some of Plaintiff's Sick Calls, (D.E. 93-11); |
| Ex. L: | Plaintiff's Medical Records – MRI/X-ray Reports, (D.E. 93-12); |

Ex. M: Plaintiff's History of Restrictions, (D.E. 93-13);

Ex. N: Plaintiff's Compression Stocking and Medical Pass History, (D.E. 93-14);

Ex. O: April 17, 2023 Email to Warden Holmes and Grievance, (D.E. 93-15);

Ex. P: Plaintiff's Sick Calls, (D.E. 93-16);

Ex. Q: Pocket Card, (D.E. 93-17);

Ex. R: TDCJ Employee/Offender Training Acknowledgement Forms, (D.E. 93-18).

## IV. Summary Judgment Standard

Summary judgment is proper if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). A genuine issue exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The court must examine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251–52.

In making this determination, the court must consider the record as a whole by reviewing all pleadings, depositions, affidavits and admissions on file, and drawing all justifiable inferences in favor of the party opposing the motion. *Caboni v. Gen. Motors Corp.*, 278 F.3d 448, 451 (5th Cir. 2002). The court may not weigh the evidence or evaluate the credibility of witnesses. *Id.* Furthermore, affidavits or declarations "must be made on personal knowledge, [shall] set out facts that would be admissible in evidence, and [shall] show that the affiant or declarant is competent to testify to the matters stated." Fed. R. Civ. P. 56(c)(4); *see also Cormier v. Pennzoil Expl. & Prod. Co.*, 969 F.2d 1559, 1561 (5th Cir. 1992) (per curiam) (refusing to consider affidavits that relied on hearsay statements); *Martin v. John W. Stone Oil Distrib., Inc.*, 819 F.2d 547, 549 (5th Cir.

1987) (per curiam) (stating that courts cannot consider hearsay evidence in affidavits and depositions). Unauthenticated and unverified documents do not constitute proper summary judgment evidence. *King v. Dogan*, 31 F.3d 344, 346 (5th Cir. 1994) (per curiam).

The moving party bears the initial burden of showing the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party demonstrates an absence of evidence supporting the nonmoving party's case, then the burden shifts to the nonmoving party to come forward with specific facts showing that a genuine issue for trial does exist. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). To sustain this burden, the nonmoving party cannot rest on the mere allegations of the pleadings. Fed. R. Civ. P. 56(c)(1); *Anderson*, 477 U.S. at 248. "After the nonmovant has been given an opportunity to raise a genuine factual issue, if no reasonable juror could find for the nonmovant, summary judgment will be granted." *Caboni*, 278 F.3d at 451. "If reasonable minds could differ as to the import of the evidence, . . . a verdict should not be directed." *Anderson*, 477 U.S. at 250–51.

## V. Discussion

### A. Injunctive Relief

A court lacks subject matter jurisdiction when a case becomes moot. *See Genesis Healthcare Corp. v. Symczyk*, 569 U.S. 66, 78–79 (2013). "A case becomes moot—and therefore no longer a 'Case' or 'Controversy' for purposes of Article III—when the issues presented are no longer live or the parties lack a legally cognizable interest in the outcome." *Already, L.L.C. v. Nike, Inc.*, 568 U.S. 85, 91 (2013) (citation modified). "If a dispute has been resolved or if it has evanesced because of changed circumstances, including the passage of time, it is considered moot." *Am. Med. Ass'n v. Bowen*, 857 F.2d 267, 270 (5th Cir. 1988) (citing *Matter of S.L.E., Inc.*, 674 F.2d 359, 364 (5th Cir. 1982)). In other words, when the controversy between parties "has

resolved to the point that they no longer qualify as 'adverse parties with sufficient legal interests to maintain the litigation,' [courts] are without power to entertain the case." *Sossamon v. Lone Star State of Tex.*, 560 F.3d 316, 324 (5th Cir. 2009) (quoting *United States v. Lares-Meraz*, 452 F.3d 352, 354 (5th Cir. 2006)).

"A case might become moot if subsequent events made it absolutely clear that the alleged wrongful behavior could not reasonably be expected to recur." *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 189 (2000) (citation modified). The party asserting mootness generally bears the "heavy burden of persuading the court that the challenged conduct cannot reasonably be expected to start up again." *Id.* (citation modified).

However, there is a wrinkle when the defendant is a public entity:

> [G]overnment actors in their sovereign capacity and in the exercise of their official duties are accorded a presumption of good faith because they are public servants, not self-interested private parties. Without evidence to the contrary, [the Court] assume[s] that formally announced changes to official governmental policy are not mere litigation posturing.

*Sossamon*, 560 F.3d at 325. Accordingly, government actors have a "lighter burden to make absolutely clear that the [allegedly unconstitutional] condition cannot reasonably be expected to recur." *Id.* (citation modified). While the "voluntary cessation of a challenged activity does not ordinarily deprive a federal court of its power to determine its legality, courts are justified in treating a voluntary governmental cessation of potentially wrongful conduct with solicitude." *Turner v. Tex. Dep't of Crim. Just.*, 836 F. App'x 227, 229 (5th Cir. 2020) (per curiam) (citation omitted). "Such self-correction provides a secure foundation for a dismissal based on mootness so long as it appears genuine." *Id.* at 229 (citation omitted).

In this action, Plaintiff seeks injunctive relief in the form of access to the full respite program, which includes, upon request, unlimited access to an air-conditioned environment

without being placed in a 3 x 3-foot holding cell. *See* (D.E. 6); (D.E. 10). The Court retained Plaintiff's failure-to-accommodate ADA and RA claims (access to "full-respite program including unlimited access to an air-conditioned environment) against the State of Texas and numerous officials in their official capacities for injunctive relief.[5] (D.E. 16, p. 72); (D.E. 46, p. 2–3).

Defendants contend that Plaintiff's ADA and RA claims for injunctive relief have been rendered moot since he is currently housed in a regular-sized cell in the McConnell Unit's 12 Building, which is fully air-conditioned. (D.E. 84, p. 19). Plaintiff did not respond directly to Defendants' argument on the issue of mootness. However, throughout his response, he discussed his ADA and RA claims and advanced arguments in favor of same. *See* D.E. 93, pp. 18, 22–34, 42–44, 56, 74, 76.

When a plaintiff fails to respond to an argument for dismissal of a particular claim, they have abandoned that claim. *See McClelland v. Katy Independent School Dist.*, 63 F.4th 996, 1010 (5th Cir. 2023) (collecting cases) ("This circuit's well-settled precedent instructs that a party abandons a claim by failing to defend it in response to motions to dismiss and other dispositive pleadings."). Here, Plaintiff's vigorous defense of his ADA and RA claims on the merits in his response belies any intent by him to abandon them. The Court, therefore, cannot conclude that Plaintiff has abandoned his ADA and RA claims seeking injunctive relief. The Court turns to consider the substance of Defendants' mootness argument. In support, Defendants have submitted Warden Wysocki's declaration in which she states:

- since October 10, 2024, Plaintiff has been housed in a regular-sized cell in the McConnell Unit's restrictive custody ("RH")12-Building, which is fully air-conditioned;

[5] The Court did not determine at screening that Plaintiff sought injunctive relief with respect to the Eighth Amendment claims retained in this case. (D.E. 16, pp. 71–72; D.E. 46, pp. 1–3).

- Plaintiff will remain in the 12-Building's RC for at least a year until the UCC and SCC conduct a custody review;
- depending on the UCC and SCC's determination, Plaintiff's custody status may remain RH or be upgraded;
- If his custody status remains RH, he will almost certainly continue to be housed in the 12 Building which is air-conditioned and does not require respite or other heat-mitigating measures;
- if his custody status is upgraded, he will likely move to a housing building with others with his new status, where he will have unlimited access to the large, air-conditioned multipurpose room within that building for respite; and
- if his custody status is upgraded and is moved to another building, he will have access to all of the heat mitigation measures required by AD-10.64 and will not be brought to the 3 x 3-foot holding cells in the 12 Building.

(D.E. 84-1, p. 3).

Significantly, Warden Wysocki's declaration indicates that Plaintiff's current and temporary housing in air-conditioned restrictive custody for at least one year did not arise from any formal policy change. Rather, Warden Wysocki's statements reflect that Plaintiff's continued housing in air-conditioned restrictive custody after one year depends on future custody-status decisions by the UCC and SCC. Because the implementation of a formal policy did not cause any permanent change to Plaintiff's current custody situation, the Court concludes that Defendants still retain a heavy burden to show that Plaintiff will not be returned to a housing situation that is not air-conditioned and where he may be again subjected to placement in a 3 x 3-foot holding cell for respite in the future. *Cf. Sossamon*, 560 F.3d at 325 (explaining that "formally announced changes to official government policy" lead to a "lighter burden" in showing that certain conditions, such as cell restrictions, are not reasonably expected to reoccur).

Warden Wysocki sets forth in her declaration various if-then scenarios regarding Plaintiff's future housing which demonstrate that, even if he is transferred from an air-conditioned cell to another building at some point in the future, he will: (1) have access to all of the heat mitigation measures required by AD-10.64 including unlimited access to respite; and (2) he will not be brought to 3 x 3-foot holding cell for respite. (D.E. 84-1, p. 3). In the Court's view, these scenarios are sufficiently exhaustive of all possible outcomes, such that Defendants have satisfied their heavy burden to show it is "absolutely clear that the alleged wrongful behavior could not reasonably be expected to start up again." *Friends of the Earth*, 528 U.S. at 189. .

Because there is no reasonable future scenario in which Plaintiff will be denied access to the heat mitigation measures set forth in AD-10.64 including respite or provided respite in the complained-of 3 x 3-foot holding cells in the 12-Building, he no longer has a stake in the controversy surrounding his ADA and RA claims seeking injunctive relief. A rare exception to the mootness doctrine, however, provides that a matter is not moot if it is "capable of repetition, yet evading review." This standard applies "in only the most exceptional circumstances." *National Center for Pub. Policy Resch. v. Securities and Exchange Comm.*, No. 23-60230, 2025 WL 1392160, at *3 (5th Cir. May 14, 2025) (per curiam). For the standard to apply, the challenged action must be so short in its duration that it cannot be fully litigated prior to its expiration or cessation, and there must be a reasonable expectation that the same complaining party will be subjected to the same action again. *See id.* (citing *Yarls v. Bunton*, 905 F.3d 905, 911 (5th Cir. 2018)).

The exception does not apply here because the remedies implemented by Defendants have been demonstrated to be permanent and lasting in nature. There is no indication that Plaintiff will again be subjected to enduring respite in the 3 x 3-foot holding cell. Plaintiff presents no arguments

to suggest any reasonable expectation that, even if he should be removed from his air-conditioned cell, he will be placed in a small holding cell for respite again in the future, or otherwise denied access to TDCJ's full-respite program.[6] *Cf. Haralson v. Campuzano*, 356 F. App'x 692, 695–96 (5th Cir. 2009) (per curiam) (holding that the rare exception to mootness did not apply because the possibility that plaintiff would be transferred back to the allegedly offending infirmary was too speculative to warrant relief).

The Court concludes that Defendants have provided sufficient remedies regarding Plaintiff's housing situation and ability to access respite without being placed in a 3 x 3-foot holding cell that makes clear the alleged wrongful behavior cannot reasonably be expected to recur. *See Friends of the Earth*, 528 U.S. at 189. Because Plaintiff is no longer subject to the conditions giving rise to his ADA and RA claims, and it has been demonstrated that the remedies are permanent in nature, his ADA and RA claims seeking injunctive relief have been rendered moot. Accordingly, Defendants' summary judgment on the issue of mootness is granted, and Plaintiff's ADA and RA claims seeking injunctive relief are dismissed without prejudice for lack of subject matter jurisdiction.[7] *See Mitchell v. Bailey*, 982 F.3d 937, 944 (5th Cir. 2020) (holding that claims dismissed for lack of subject matter jurisdiction are dismissed without prejudice).

---

[6] As Warden Wysocki states, Plaintiff was housed—starting on October 10, 2024—in a regular-sized air-conditioned cell in the McConnell Unit's restrictive custody ("RH") Building. (D.E. 84-1, p. 3). In connection with an emergency motion for a TRO recently filed by Plaintiff, (D.E. 101), Plaintiff was moved on June 17, 2026, from his air-conditioned cell in the 12 Building to a non-air-conditioned cell in the same building. (D.E. 101, p. 1); (D.E. 103-1, p. 1). According to Warden Wysocki, however, Plaintiff was returned to an air-conditioned cell one week later on June 24, 2026. (D.E. 103-1, p. 1). Plaintiff has come forward with no evidence to show that, during this one-week period, he was denied access to any heat mitigation measures provided in AD-10.64 or was otherwise placed in a 3 x 3-foot holding cell for respite. The Court finds that this incident confirms that Plaintiff will not be subjected to the complained-of wrongful behavior even should Plaintiff be moved from an air-conditioned cell at some point in the future.

[7] Because his request for injunctive relief has been rendered moot, it is unnecessary for the Court to consider: (1) Defendants' alternative argument that his requested injunction is impermissible under the

**B. Summary Judgment Evidence Relevant to Plaintiff's Claims on the Merits**

*i. Plaintiff's Statements in his Amended Complaint and More Definite Statement (along with attachments thereto)*

a. Plaintiff's medical conditions, disabilities, and limitations

Plaintiff states that he suffers from the following physical and mental health conditions: hyperlipidemia; Type II diabetes; hypertension; seizures (TBI); Major Depression Disorder with psychotic features; Post-Traumatic Stress Disorder ("PTSD"); and schizophrenia. (D.E. 10, p. 2). Plaintiff states further that he takes the following medications: (1) Verapamil, for hypertension; (2) Atorvastatin, for hyperlipidemia; (3) Metformin, Glipizide, and Novolin, for type II diabetes; and (4) Haloperidol (or Haldol), for schizophrenia. *Id.* Plaintiff has the following work restrictions in place for excessive heat conditions: (1) no work in direct sunlight; (2) no temperature extremes; and (3) no humidity extremes. *Id.*

Plaintiff states that in 2010 the Social Security Administration determined him to be disabled "due to a vehicle v. pedestrian automobile accident." (D.E. 10, p. 3). As a result of the accident, Plaintiff suffers from what he calls a lateral pelvic tilt, or short-leg syndrome, which he claims causes him to walk with an awkward gait. *Id.* Plaintiff states that he further suffers from chronic pain syndrome with pain reaching his feet, ankles, left leg, left knee, hip, entire back, and lower neck. *Id.* According to Plaintiff, his pain levels are exacerbated "while performing activities of daily living." *Id.* Plaintiff's alleged physical limitations include the inability to stand, lift, bend, stoop, squat, sit, and walk. *Id.* His alleged mental limitations include the inability to sleep, think, concentrate, read, and breathe when he has panic attacks. *Id.* Plaintiff states that his accident led

PLRA (D.E. 84, pp. 20-21); or (2) the parties' respective arguments as to the merits of Plaintiff's ADA and RA claims (D.E. 84, pp. 31-34; D.E. 93, pp. 72-74).

to him having PTSD, schizophrenia, and Major Depressive Disorder with psychotic features. *Id.* Plaintiff further states that, [w]ith respect to excessive heat, [his] respiratory, circulatory, digestive, and endocrine major bodily functions are impaired." *Id.*

b. Plaintiff's requests to be placed in an air-conditioned environment

Plaintiff states that his prison cell (before he was moved to the 12 Building) often had heat indices of over 100 degrees. (D.E. 93, p. 13). Plaintiff requested specific accommodations for his disabilities through Step 1 and Step 2 grievances, in which he requested to be placed in an air-conditioned environment without being placed inside a small holding cell. (D.E. 10, p. 4). In a Step 1 grievance dated June 10, 2022 (Grievance No. 2022109768), Plaintiff complained about the excessive heat conditions and sought either to be placed in an air-conditioned cell or to be transferred to another unit that could meet his heat restriction needs. (D.E. 6, p. 27).

Plaintiff states that he made a further accommodation request for an air-conditioned environment on April 17, 2023, through an email to which a Step 1 grievance was attached. (D.E. 10, p. 4). In a Step 1 grievance dated April 17, 2023 (Grievance No. 2023093591), Plaintiff again sought either to be placed in an air-conditioned cell or to be transferred to a unit that could meet his heat restrictions needs. (D.E. 6, p. 23). Plaintiff indicates he sent the email to Warden Holmes, Warden Samaniego, and Warden Flannel. (D.E. 10, p. 4). Plaintiff made similar accommodation requests at the Step 2 grievance level. *Id.* In response to his Step 2 grievance dated June 13, 2023, Plaintiff was informed that his Heat Sensitivity Score was P00, and that Plaintiff therefore did not meet the criteria for air-conditioned housing. (D.E. 6, p. 25).

Plaintiff indicates that he made multiple requests for the specific accommodation of an air-conditioned environment with Sergeant Jimenez, Sergeant Gonzalez-Diaz, and Sergeant Perez. (D.E. 10, p. 4). During "so called wellness checks" conducted on August 1, 2023, August 7, 2023,

and August 8, 2023, Plaintiff's request for a similar accommodation was made to Lieutenant Cavazos. *Id.*

c. Plaintiff's statements regarding TDCJ's excessive heat policy

Plaintiff states that Administrative Directive 10.64 ("AD-10.64") is designed to protect inmates from suffering heat cramps, heat exhaustion, and heat stroke. (D.E. 10, p. 6). According to Plaintiff, AD-10.64 requires the accommodation of inmates with medical conditions that are aggravated by excessive heat and the accommodation of medical conditions that require certain medications that are adversely affected by excessive heat. *Id.* These accommodations, Plaintiff says, consist of implementing safety measures to keep inmates hydrated and their bodies as cool as possible, such as through cold showers. *Id.*

Plaintiff states that the "full respite program consist[s] of unlimited iced water, unlimited cold showers throughout the day per AD-10.64[,] and unlimited access to air-conditioned environments upon request(s)." *Id.* at 5. According to Plaintiff, his injuries caused by the failure of prison officials to fully implement AD-10.64 included heat cramps, palpitations, shortness of breath, dizziness, trouble concentrating, lightheadedness, inability to stand walk, or lift without chest pains, fatigue, insomnia, impairment of the thermoregulatory regulatory system, and impaired respiratory, circulatory, endocrine, cardiovascular and digestive systems. (D.E. 10, p. 10).

d. Plaintiff's statements regarding the denial or delay of respite requests

Plaintiff states that, from April 2022 through August 2022, when Warden Sanchez was the McConnell Unit's warden, each of his 30 to 50 requests for respite in an air-conditioned environment was denied. (D.E. 6, p. 12). In response to the Court's inquiry about incidents where he was denied respite from April 2022 through August 2022, Plaintiff states there was a policy

presumably put in place by Warden Sanchez contrary to AD-10.64, where all of the 300 inmates with a G5 custody status like Plaintiff were automatically denied respite. (D.E. 10, p. 16). Plaintiff believes that this policy was in place because there was not enough staff and other resources to handcuff all 300 G5 inmates and escort them to and from an air-conditioned environment. *Id.* Plaintiff states that he suffered the following medical and mental conditions in connection with the denial of respite during these months in 2022: heat cramps; chest pains; palpitations; inability to stand, walk or lift without feeling chest pains; fatigue; impairment of the thermoregulatory system; and impaired circulatory, endocrine, cardiovascular and digestive systems. (D.E. 10, p. 17).

Plaintiff acknowledges that although he had no access to air-conditioned environments during these months, he was provided access to showers one to three times per week and was getting cold water. *Id.* Plaintiff denies that he was ever given access to "full respite" during these months. *Id.* Plaintiff states that his requests for respite at all times generally were denied in 2022 by Sergeant Jimenez, Sergeant Gonzalez-Diaz, and Sergeant Perez due to the lack of availability of staff and staff shortages to escort him to the air-conditioned areas. (D.E. 10, p. 5). Plaintiff lists the following incidents in the summer of 2023 where he sought to be taken to respite:

- June 29, 2023 (11:40 p.m.) – Sergeant Gage Rivas denied Plaintiff's request for respite due to understaffing. (D.E. 10-1, p. 2).
- June 30, 2023 (10:00 a.m. and 4:40 p.m.) – Officer Erritt denied Plaintiff's requests for respite because no space was available. After checking for availability, Officer Erritt escorted Plaintiff to respite at 6:20 p.m. on June 30. *Id.*
- July 1, 2023 (10:15 a.m.) – Officer Nathaniel Smith denied Plaintiff's requests for respite due to staff shortages, meaning that no escort was available. *Id.*
- July 2, 2023 (9:30 a.m.) – Plaintiff asked an officer to speak with Sergeant Gonzalez-Diaz about his request to receive an escort to respite. Plaintiff, however, did not receive respite due to understaffing. *Id.*

- July 3, 2023 (10:00 a.m.) – Plaintiff requested respite from an officer during a "special count." Plaintiff was not escorted to respite until 3:41 p.m. where he stayed until 5:47 p.m. *Id.*

- July 4, 2023 (9:45 a.m.) – Plaintiff requested respite from an unknown officer during a "special count." Due to staff shortages, Plaintiff was not taken to respite until later in the afternoon. An unknown officer brought Plaintiff to respite in Building 12 at 4:09 p.m. *Id.* at 3.

- July 5, 2023 (9:09 a.m.) – Plaintiff requested respite from an unknown officer. Plaintiff asked the officer to speak to Sergeant Jimenez who was the supervisor on duty. Plaintiff was not offered respite until 4:50 p.m. when two officers approached to take him to the diabetic clinic for his daily insulin. Around 5:00 p.m., Plaintiff spoke to Warden Samaniego and Sergeant Jimenez, who indicated that the delay in accessing respite was due to understaffing. *Id.*

- July 9, 2023 – Plaintiff requested respite at an unknown time from Officer Torres, who relayed Plaintiff's request to Sergeant Gonzalez-Diaz. At 5:50 p.m., Officer Torres escorted Plaintiff to his insulin treatment and then to respite at the 12 Building at 6:06 p.m. Plaintiff left the respite area in Building 12 at 9:15 p.m. *Id.*

- July 10, 2023 (10:18 a.m.) – Plaintiff requested respite from Officer Torres, who then checked to see whether space was available in the 12 Building. Officer Torres received no response. At 11:25 a.m., Plaintiff requested respite from Sergeant Garcia. Plaintiff, however, was not offered respite until 6:30 p.m. when he was escorted for his daily insulin injection. Plaintiff declined respite because the sun was going down. *Id.* at 4.

- July 11, 2023 – Plaintiff requested respite during the morning count. Plaintiff, however, arrived at the respite location in Building 12 at 6:06 p.m., where he stayed for three hours. *Id.*

- July 12, 2023 (10:18 a.m.) – Plaintiff requested respite during the morning count. He arrived at the respite location at 9:15 a.m. and stayed until 1:30 p.m. *Id.*

- July 13, 2023 – Plaintiff requested respite during the morning count. At 3:00 p.m., Sergeant Jimenez approached Plaintiff's cell and told Plaintiff he would escort Plaintiff to respite "when he is done with some move." *Id.* at 5.

- July 14, 15, and 16, 2023 (Friday through Sunday) – Sergeant Perez confirmed to Plaintiff that no escorts were available to take him to respite each of these three days due to understaffing. *Id.*

- July 17, 2023 (10:00 a.m.) – Plaintiff requested respite from Officer Nathaniel Smith. However, Plaintiff received no respite that day. *Id.*

- July 18, 2023 (10:18 a.m.) – Plaintiff requested respite from an unknown officer and also instructed the officer to inform the sergeant on duty of his request. Plaintiff did not receive respite until 5:55 p.m., after his insulin injection. Plaintiff received respite inside a medical cell for 90 minutes. *Id.*

- July 19, 2023 – Plaintiff was taken to a multi-purpose room in connection with a shakedown. Later that day, no escort was available for his insulin injection, and Plaintiff was not taken to respite. *Id.*

- July 20, 2023 – Plaintiff requested respite at an unknown time from "Sgt. Hernandez/Fernandez from D.card." Plaintiff, however, was not offered respite until 6:00 p.m. when he went for his daily insulin injection. Plaintiff declined respite because it was late in the day. *Id.*

- July 21, 2023 – Plaintiff requested respite at 11:15. At 11:57 a.m., he was escorted to respite at the 12 Building where he stayed until 3:45 p.m. *Id.* at 6.

- July 22, 2023 – Plaintiff's request for respite was denied due to no availability of escorts. *Id.*

- July 23, 2023 – Plaintiff requested respite at noon. He arrived at the respite location at 1:15 p.m. where he stayed until 4:30 p.m. *Id.*

- July 24, 2023 – Plaintiff requested respite from Officer Arriola at 10:30 a.m. and instructed him to pass along his request to the sergeant. Plaintiff received no response to his request and no respite on this day. *Id.*

- July 25 and 26, 2023 – Plaintiff requested respite each of these two days around the morning count-time from 9:45 to 10:15 a.m. An unknown sergeant informed Plaintiff that no escort was available. *Id.*

- July 27, 2023 – At 10:15 a.m., Plaintiff was informed by an unknown official that there was no availability in respite in Building 12 but that the official would let Plaintiff know when there was room. The officer, however, never provided Plaintiff with a status update. Plaintiff was later informed that no escort was available due to understaffing. Lastly, Plaintiff writes: "no respite showers." *Id.*

- July 28, 2023 – Plaintiff did not receive respite because no escort was available due to understaffing. *Id.*

- July 29, 2023 – Plaintiff requested respite from Sergeant Garcia at 11:45 a.m. Garcia responded that no escorts were available. *Id.*

- July 30, 2023 – Plaintiff requested respite from Officer Oliveres during the morning count. Officer Oliveres responded that no escorts were available. *Id.*

e. Plaintiff's lack of access to the "full respite program"

On March 7, 2022, Plaintiff's custody status was downgraded to "G5." (D.E. 10, p. 1). According to Plaintiff, G5 custody status means that he is confined to closed custody status 24-hours per day and that he is required to have an escort and hand restraints when moving about the unit. *Id.*

Plaintiff states that his G5 custody status required him to sit on a stool in a 3 x 3-foot holding cell when placed in respite. *Id.* at 11. Plaintiff, therefore, was placed in a small holding cell each time he was afforded respite, with one exception occurring on July 18, 2023, when he was placed in an air-conditioned medical cell and allowed to lie down. *Id.* at 11, 13. Warden Sanchez, Warden Holmes, and Warden Amonett enforced this policy where inmates in G5 status must be placed in a 3 x 3-foot holding cell. *Id.* at 11.

Plaintiff states he was harmed by being placed in the cage because there is no way to elevate or lengthen his left leg, which is swollen due to his diabetes and lymphedema. (D.E. 6, p. 10). Plaintiff further states that his diabetic condition caused him to urinate frequently, and that no official was available to escort Plaintiff to the restroom. (D.E. 10, p. 12). As a result, Plaintiff says, he was forced to empty his water bottle and urinate into the bottle. *Id.*

Plaintiff explains that his diabetic condition causes excessive thirst, and that no official was available to provide him water while he was confined in the 3 x 3-foot holding cell. *Id.* According to Plaintiff, his injuries caused by the lack of access to the "full respite program" included heat cramps, palpitations, body pains due to not being able to lay down in the small holding cell,

inability to stand, walk, or lift without chest pain, fatigue, impairment of the thermoregulatory system, and impaired circulatory, endocrine, cardiovascular and digestive systems. *Id.* at 12–13.

Plaintiff states that he "was afforded access to an air conditioned environment due to litigation." (D.E. 10, p. 13). Plaintiff acknowledges that, since June 27, 2023, he has been provided access to four to five cold showers per week and that "[c]old water was available most of the time in [his] housing area." *Id.*

Plaintiff states that McConnell Unit officers never performed wellness checks. (D.E. 10, p. 6). Plaintiff then indicates that no offers of cold showers meant no wellness checks, indicating that such offers constituted the definition of a wellness check. *Id.* According to Plaintiff, his injuries caused by the lack of wellness checks included chest pains, fatigue, dizziness, heat cramps, labored breathing, inability to sweat properly, insomnia, palpitations, impairment of the thermoregulatory system, impaired respiratory, impaired cardiovascular, and impaired digestive systems. *Id.*

Plaintiff next complains about McConnell Unit officials' failure to ensure that adequate space was available for all inmates requesting respite. (D.E. 10, p. 7). According to Plaintiff, his injuries caused due to the lack of available space included labored breathing, palpitations, insomnia, shortness of breath, heat cramps, chest pains, dizziness, fatigue, inability to sweat properly, impairment of the thermoregulatory system, and impaired respiratory, circulatory, endocrine, cardiovascular and digestive systems. *Id.*

Plaintiff further holds McConnell Unit officials as responsible for failing to ensure that escorts were available when Plaintiff requested respite. (D.E. 10, p. 7). According to Plaintiff, his injuries caused due to the lack of available escorts included palpitations, chest pains, labored breathing, heat cramps, dizziness, inability to sweat properly, insomnia, shortness of breath,

impairment of the thermoregulatory system, and impaired respiratory, circulatory, endocrine, cardiovascular and digestive systems. *Id.*

f. Plaintiff's statements regarding inadequate medical care

Plaintiff submitted sick call requests ("SCRs"), related to his symptoms and complications from exposure to excessive heat, to the McConnell Unit medical department on the following dates:

In 2022: March 28; April 12; May 9; May 12; May 15; May 30; June 2; June 6; June 8; June 11; June 12; June 15; June 18; June 21; June 23; June 26; July 6; July 13; July 14; July 18; and August 2.

In 2023: March 30.

(D.E. 10, p. 14). In these SCRs, Plaintiff reported the following symptoms: palpitations; chest pains; lightheadedness; dizziness; shortness of breath; labored breathing; heat cramps; inability to sweat properly; trouble concentrating; inability to stand, walk, or lift without feeling chest pains during the excessive heat; fatigue; trouble sleeping; impairment of the thermoregulatory system; and impaired respiratory, circulatory, endocrine, cardiovascular and digestive systems. *Id.* Plaintiff never made any requests for specific medical treatments in connection with his sick call requests, as he expected medical personnel to know what to do. *Id.*

According to Plaintiff, Dr. Kwarteng reviewed multiple SCRs. (D.E. 6, p. 18). Dr. Kwarteng, Plaintiff says, responded to five SCRs in writing. (D.E. 10, p. 15–16). Plaintiff explains that Dr. Kwarteng never performed any examinations on Plaintiff or provided any treatments. *Id.* at 16. His written responses to five SCRs are as follows:

- June 6, 2022: "You have been assigned appropriate medical restrictions[;]"
- June 6, 2022: "You have all heat restrictions, you can always ask for respite[;]"

- June 23, 2022: "You have all the medical restrictions based on your medical and other conditions. The medical department does not assign inmates to special housing areas[;]"
- July 14, 2022: "Medical Dept[.] does not control respite. Please direct your concerns to TDCJ[;]"
- August 2, 2022: "1. You have heat restrictions[.] 2. You can also ask to be taken out for respite[.] 3. Stay hydrated."

*ii. Heat-Mitigation measures at the McConnell Unit*

a. Administrative Directive 10.64, heat score, and heat restrictions

Defendants have submitted into evidence the tenth version of AD-10.64, effective May 8, 2020,[8] which was adopted to address extreme temperature conditions in TDCJ. (D.E. 84-5, p. 2–17). AD-10.64 includes specific heat mitigation measures that are intended to protect all offenders regardless of their individual risk level. *Id.* at 5–7. Section IV(E) of AD-10.64, entitled "Offenders shall be allowed access to respite areas during periods of excessive heat[,]" provides that "[o]ffenders may request access to a respite area 24 hours per day, seven days per week, even if they are not feeling ill at the time of the request or the request is made during count time." *Id.* at 7. Offenders are also permitted to stay in the respite area as long as necessary. *Id.* at 7. In addition, offenders requesting such access "are not required to be seen by medical staff unless they are exhibiting signs or symptoms of a heat-related illness." *Id.*

Pursuant to AD-10.64, drinking water and cups are required to be available to every offender during periods of excessive heat, and hydration is encouraged. *Id.* at 5. This directive also requires prison units to take extra precautions where the heat index is above 90 degrees, including, but not limited to:

---

[8] The eleventh, and presumably, latest version of AD-10.64 became effective on May 1, 2024, after the incidents described in this lawsuit. (D.E. 84-5, p. 18–35).

- Providing additional water and cups in offender dorms, housing areas, recreational areas, and during mealtimes, along with ice;
- Transporting offenders during the coolest hours of the day when possible;
- Allowing offenders to utilize and carry cooling towels;
- Allowing offenders to wear shorts and t-shirts in the dayrooms and recreational areas;
- Ensuring maintenance of fans, blowers, and showers in offender housing areas;
- Allowing additional showers for offenders when possible;
- Lowering the water temperature for single temperature showers in offender housing areas; and
- Allowing fans for offenders in all custody levels, to include restrictive housing and disciplinary status, and ensuring the fan program is in place allowing the permanent issuance of fans to indigent offenders.

*Id.* at 8–9.

Pursuant to AD-10.64, the wardens at TDCJ units are instructed to implement additional precautions when excessive heat or heat-wave conditions last more than three consecutive days by initiating the Incident Command System (ICS). *Id.* at 9. Under these conditions, wardens may restrict and potentially cancel outside work and recreation as well as reduce kitchen and dish room operations as needed. *Id.* Offenders are also permitted to purchase "electrolyte sports drinks from the unit commissary without affecting their spending limit." *Id.*

Under the AD-10.64, TDCJ recognizes that "some offenders are potentially at a heightened risk of heat-related illnesses because of their age, health conditions, or medications." *Id.* Accordingly, AD-10.64 explains that inmates are assessed an automated heat sensitivity score using information from the inmate's medical records and that "[o]ffenders who have a heat

sensitivity score receive priority placement in a housing area that is air-conditioned." *Id.* at 10–11. Dr. Glenda M. Adams explains in her expert affidavit:

> [I]n 2017, TDCJ sought to automate identification of inmates at increased risk for a heat-related illness due to age, medical condition(s) and prescribed medication(s). TDCJ requested that information about potential heat injury risk factors recorded in an inmate's CMHC electronic health record (EHR) be automatically transmitted to TDCJ's computer system. This health information is now utilized by TDCJ to generate a 'heat sensitivity score.' TDCJ utilizes its proprietary 'heat sensitivity score' to identify inmates considered *most* susceptible to heat injury. Inmates with higher 'heat sensitivity scores' are given priority for assignment to air-conditioned housing or cool beds.

(D.E. 86, p. 33).

AD-10.64 specifically references the "Heat Restriction List" as a "list of offenders with restrictions related to physical activities, transportation, and work that have been entered in the restrictions Module of the electronic health record ("EHR") and transmitted to the TDCJ mainframe HSIN screen." (D.E. 84-5, p. 3). The policy further provides that:

> During each security round, staff shall use the Heat Restriction List to conduct wellness checks for offenders on that list. Staff shall immediately seek care for any and all offenders requesting medical assistance or exhibiting signs of illness, even if they are not listed on the Heat Restriction List.

*Id.* at 7. Plaintiff was one of the inmates on the Heat Restriction List, dated June 16 through June 26, 2023. (D.E. 93-9, p. 2–7).

In addition, medical providers with the University of Texas Medical Branch ("UTMB") may assign inmates heat-related medical restrictions on their housing, transportation, and/or prison jobs. *See* (D.E. 86, p. 33). Heat-related work restrictions may include: (1) no work in direct sunlight; (2) no temperature extremes; and (3) no humidity extremes. *Id.* at 32. These restrictions are communicated by UTMB officials to TDCJ via HSM-18 forms and aid TDCJ classification

committees in making inmate housing and work assignments. *Id.* at 32–33. While UTMB medical officials assign various medical restrictions, TDCJ officials are responsible for determining respite areas as well as an inmate's security status, housing assignment, and work assignment. *Id.* at 33. Dr. Adams explains:

> UTMB/CMC periodically reviews the medical literature for new information on factors which can predispose a patient to an elevated heat-injury risk and updates the electronic forms transmitted to TDCJ as indicated. At inmate intake into TDCJ, at subsequent unit transfers and/or patient encounters, and whenever a patient's clinical status changes, UTMB updates information in the electronic health record and that information automatically interfaces with TDCJ's computerized Classification System.

*Id.* at 33.

AD-10.64 contains additional provisions for first-aid measures in the event of a heat-related illness or injury and features a standardized annual training program that is required at each unit to ensure prevention of injuries due to excessive or extreme temperatures. (D.E. 84-5, p. 10–15). Training is required for both officers and offenders. *Id.* at 11–15. TDCJ staff is required to complete hot weather training annually, no later than April 15 of each year. *Id.* at 12. Offenders, in connection with their training, are provided with an information flyer for heat, cold, and suicide prevention as well as with "unit-specific heat mitigation measures upon arrival at a new unit." *Id.* at 14.

*iii. Statements from current and past McConnell Unit Wardens*

Current McConnell Unit Warden Wysocki and former Wardens Amonett, Holmes, and Sanchez uniformly state that the following heat-mitigation measures were provided to inmates in concert with AD-10.64:

- Inmates may request access to respite areas at any time, including during lockdowns and countdowns, and are allowed to stay in respite as long as necessary, all the while being provided cups, cold hydrating drinks, and electrolyte packets.

- Inmates are permitted to use the restroom and return to respite if necessary.

- While respite areas do not serve as a substitute for housing assignments and are meant only as cool-down areas, there is no maximum time set for inmates to stay in respite areas.

- Typically, inmates spend no more than 30-60 minutes in a respite area to cool down.

- All inmates, regardless of their custody level, are permitted to bring items with them to respite which have been ordered by medical providers.

- For example, if an inmate is provided compression stockings as part of his medical treatment, the inmate may wear those stockings in the respite area.

- At all relevant times during the tenure of each warden, the only McConnell Unit building fully air-conditioned is the 12 Building, which houses inmates in restrictive housing ("RH"), TDCJ's highest custody statuses.

- A kestrel device installed in the 12-Building monitors and tracks temperature, humidity, heat index, and dew point to ensure that the air-conditioning is functioning correctly at all times.

(D.E. 84-1, p. 1–2); (D.E. 84-2, p. 1–2); (D.E. 84-3, p. 1–2); (D.E. 84-4, p. 1–2).

Warden Wysocki states that the remaining housing buildings currently are not air-conditioned, but each has at least one large air-conditioned multipurpose room which is used as a respite area. (D.E. 84-1, p. 2). Warden Amonett indicates that, due to a budget increase, TDCJ was able to install air-conditioners in these large, multipurpose rooms. (D.E. 84-2, p. 2). According to Warden Wysocki, these multipurpose rooms measure approximately 33 x 49-feet, can accommodate up to 57 inmates at one time, and contain benches and tables. *Id.* She explains that inmates typically use the multipurpose rooms in their housing buildings for respite, but respite is also available in the infirmary, library, education building, and lower administration building, and various areas within 12-Building. *Id.*

Warden Amonett, who was the Senior McConnell Unit warden from July 15, 2023, until February 28, 2025, states that:

> Before installation of air-conditioning in the multipurpose rooms, inmates (other than those housed in 12-Building) left their housing buildings for respite, and the location of that respite depended on their custody status. TDCJ's custody levels ranged from G1-G5, with G1 being the least restrictive and G5 being the most restrictive (other than RH). Because inmates with G1-G3 custody levels were considered lower risk and could move throughout the unit without escorts, they were free to use communal respite areas such as the library, chapel, education building, or lower administrative building. By contrast, because inmates with G4 and G5 statuses must be escorted everywhere and cannot mix with other inmates, they were typically brought to 12-Building for respite.

(D.E. 84-2, p. 1–2). Warden Holmes and Warden Sanchez, both serving as McConnell Unit senior wardens before Warden Amonett, provide similar statements with regard to inmates access to respite. (D.E. 84-3, p. 1–2); (D.E. 84-4, p. 1–2). With respect to the availability of respite in the 12 Building for high security inmates, Wardens Amonett, Holmes, and Sanchez each explain:

> There were two types of respite areas in 12-Building. First, 3' x 3'x holding cells. Second, legal booths which measure either 3' x 3' or 6' x 5'. Both the holding cells and legal booths contained a stool, and inmates using those areas for respite had access to cold water and bathroom facilities upon request. The use of these small respite areas for G4 and G5 inmates was not punitive, and I never believed that placing inmates in those areas for respite posed a risk of harm, especially since inmates only remained in respite areas for short periods of time. The reason we used the 12-Building holding cells and legal booths for G4/G5 respite was because there were no other air-conditioned areas available which we could use without posing serious security concerns. The remaining respite areas in the unit were already occupied by G1-G3 inmates, and it was against both TDCJ policy and my own good judgment to mix more dangerous G4/G5 inmates with these lower custody inmates. Nor could we use regularly-sized cells or other larger areas within 12-Building for respite, since those cells and areas were being used by other inmates assigned to that building. Even if there were regularly-sized empty cell in 12-Building (which was very rare), we could not use those cells for respite because a chain bus could arrive at any time with inmates who, per their custody statues, must be housed there. I recognize that using small holding cells and legal booths for respite was less than ideal, but it was the only option (before air-conditioning was installed in the multipurpose rooms) to ensure G4/G5 inmates received respite while maintaining unit-wide security.

(D.E. 84-2, p. 2); (D.E. 84-3, p. 2); (D.E. 84-4, p. 2).

Wardens Wysocki, Amonett, Holmes, and Sanchez each state that "inmates' access to respite was sometimes delayed or limited due to understaffing, which was a persistent problem across TDCJ" while each warden served as the McConnell Unit's warden. (D.E. 84-1, p. 2); (D.E. 84-2, p. 2); (D.E. 84-3, p. 2); (D.E. 84-4, p. 2). Each warden attests:

- The McConnell Unit operated at below 50% staffing at all relevant times.
- All decisions regarding hiring and allocation of staff across units are made by TDCJ's Security Operations and Assessments Department.
- Each senior warden has or had no power to hire staff to fill shortages.
- The most each warden could do was impose mandatory overtime and request temporary assistance from officers at other units—which was frequently done—but these efforts were often limited by employment policies and understaffing at other units.
- Notwithstanding, one of the top priorities for each senior warden was to ensure that the respite requirements of AD-10.64 were met, and each warden made every effort to utilize staff efficiently to do so.
- For example, if there was a limited number of escorting officers available on a hot day, the senior warden instructed the officers to prioritize escorting G4/G5 inmates to and from respite areas, even if doing so means that fewer officers were available to perform less-important (though technically mandatory) duties such as escorting inmates to the library or education building.
- Each warden also instructed officers to prioritize escorting inmates to respite areas who showed signs of heat-related symptoms such as sweating, heavy breathing, or lethargy.
- Based on these and other efforts, none of the senior wardens believed that any inmate was ever denied respite entirely on high-temperature days during his or her time as senior warden.
- Rather, at most, inmates' access to respite may have been slightly delayed, or the duration of their respite may be shortened.

(D.E. 84-1, p. 2); (D.E. 84-2, p. 2–3); (D.E. 84-3, p. 2–3); (D.E. 84-4, p. 2–3). Wardens Wysocki and Sanchez further explain that "respite—like food, showers, and medical care—is considered a basic need, and [each] ensure[d] that inmates were never deprived of that need on [his or her] watch." (D.E. 84-1, p. 2); (D.E. 84-4, p. 3).

Wardens Wysocki, Amonett, Holmes, and Sanchez uniformly state the following:

> While waiting for respite, inmates always have access to cold water and other heat-mitigation measures outlined in AD-10.64. Moreover, regardless of staffing, I instruct officers to ensure that every single inmate on the daily heat restriction list provided by UTMB receives wellness during their security rounds as required by the policy, and I am not aware of any instance when this did not occur. I and other McConnell Unit officials take prevention of heat-related illnesses very seriously, and all unit staff are consistently trained in and reminded of the necessary efforts they must take to avoid such illnesses from developing. Trainings on heat policy [take or took] place during onboarding, yearly refreshers, and periodic on-the-job trainings. Officers [are or were] reminded of the requirements of AD-10.64 during turn-out on hot days.

(D.E. 84-1, p. 3); (D.E. 84-2, p. 3); (D.E. 84-3, p. 3); (D.E. 84-4, p. 4). Wardens Amonett, Holmes, and Sanchez each indicate that "a seasonal preparedness checklist was frequently distributed." (D.E. 84-2, p. 3); (D.E. 84-3, p. 3); (D.E. 84-4, p. 4). Warden Wysocki states that officers "carry a pocket card which includes information on recognizing and responding to heat-related illnesses." (D.E. 84-1, p. 3).

Lastly, Wardens Amonett, Holmes, and Sanchez each attested as follows:

> While I cannot say with certainty that every portion of AD-10.64 was followed at all times, and there were instances where understaffing may have delayed or limited respite access, I can attest with certainty that I did everything in my power as Senior Warden to ensure compliance with the AD-10.64 and protect inmates from heat-related illness. At no point did I institute a policy or practice of limiting or prohibiting certain inmates from receiving respite or wellness checks.
>
> Other than through this lawsuit, I am not personally aware of Plaintiff Jewell Thomas and have no recollection of communicating with him directly. Nor do I have any recollection of [Plaintiff] submitting grievances about heat-related issues while I was the McConnell Unit Senior Warden. However, I am confident that any

> grievances he may have submitted were thoroughly investigated by unit- and state-level grievance staff and responded to appropriately in a timely fashion

(D.E. 84-2, p. 3); (D.E. 84-3, p. 3); (D.E. 84-4, p. 3).

*iv. Plaintiff's custody status, housing, and access to heat-mitigation measures*

In her expert affidavit, Dr. Adams states that Plaintiff arrived at the McConnell Unit on October 1, 2021, after entering into TDCJ custody on June 22, 2021. (D.E. 86, p. 2). Warden Wysocki states that Plaintiff "has a long history of violent staff assaults beginning in early 2022." (D.E. 84-1, p. 3). She explains:

> Based on this behavior and other factors, [Plaintiff] was assigned G5 custody status from March 9, 2022 through May 9, 2024 and housed in 8-Building along with other G5 inmates. Other than RH, G5 is the highest custody status. Because of the danger they pose to staff and other inmates, G5 inmates are restricted to their cells for most of the day, cannot mix with inmates with lower custody level, and cannot move anywhere in the unit without an escorting officer.
>
> On May 29, 2024 [Plaintiff's] custody level was upgraded to G4. However, on October 10, 2024, following a series of staff assaults, [Plaintiff's] status was downgraded to RH by the Unit Classification Committee ("UCC") and State Classification Committee ("SCC") .... [Plaintiff] has been housed in 12-Building (in a regular-sized cell) since then, and he will remain in 12-Building (in a regular-sized cell) for at least a year until the UCC and SCC review his custody status. Depending on the UCC and SCC's determination, his custody status may remain RH or be upgraded. If his custody remains RH, he will almost certainly continue to be housed in 12-Building. If his custody status is upgraded, he will likely move to a housing building with others with his new status. For example, if his custody status is upgraded to G5, he will likely move back to 8-Building, where he was housed from 2022-2024.
>
> Because 12-Building is fully air-conditioned and RH inmates do not leave their housing areas except for brief periods of recreation, [Plaintiff] does not currently require respite or any other heat-mitigation measures. If his custody status is upgraded and he is moved to another housing building, he will have access to all of the heat-mitigation measures required by AD-10.64. For respite, he will have unlimited access to the air-conditioned multipurpose room within his new housing building, and will not be brought to the 3'x 3' 12-Building holding cells about which he complains in this lawsuit. It is my understanding that [Plaintiff] has been assigned compression stockings by his medical providers, and he will be permitted to wear those stockings while in respite in the future, as he has been permitted in

> the past. [Plaintiff] does not currently have a heat score or any other medical indication of susceptibility to heat-related illness, but if that changes he will also receive wellness checks as described in AD-10.64. And to the extent Thomas has heat-related work restrictions assigned by medical in the future, he will only be assigned to a prison job which comports with those restrictions.

*Id.*

*v. Plaintiff's medical history*

a. <u>General medical history</u>

In her expert affidavit, Dr. Adams notes that, upon Plaintiff's arrival into TDCJ custody on or about June 22, 2021:

> Plaintiff had a medical history of 1) hypertension (HTN) diagnosed in 2002, 2) type 2 diabetes mellitus (DM II) diagnosed in 2015, 3) hyperlipidemia (HLD), i.e. elevated cholesterol, triglycerides, and other blood lipids, 4) gastroesophageal reflux disease (GERD), 5) decreased visual acuity requiring reading glasses, 6) alcohol abuse, and 7) mental illness with past diagnoses of major depression, PTSD (post-traumatic stress disorder), and schizophrenia with auditory and visual hallucinations.

(D.E. 86, p. 2–3). After arriving in TDCJ custody, however, Plaintiff has only been diagnosed with PTSD. *Id.*

Dr. Adams's affidavit further reflects that, upon his arrival into TDCJ custody, "[Plaintiff] reported injuries from a motor vehicle accident in 1996 that resulted in a traumatic brain injury and subsequent seizure disorder, chronic low back pain, and multiple surgeries on his lower left leg with residual deformity and recurrent edema (swelling)." *Id.* The objective medical evidence further shows that:

- Plaintiff has complained "of limb shortening, pelvic tilt, and generalized chronic pain as sequelae of his left lower leg injuries." *Id.*
- Radiographs confirm chronic deformities of the left tibia and fibula along with "secondary left tibial talar and talonavicular joints osteoarthrosis' (i.e. ankle arthritis)." *Id.* at 5, 52.

- A CT scan of Plaintiff's "left lower extremity further confirms 'chronic healed fracture deformities involving the left tibia and fibula' and 'soft tissue swelling and edema in the left calf and left foot.'" *Id.* at 5, 55.

During his TDCJ incarceration, medical staff provided Plaintiff with multiple accommodations to meet his medical needs, including the issuance of certain medical passes. *Id.* at 4. Dr. Adams states that:

> At various times, [Plaintiff] has been provided HSM18 restrictions of 1) lower bunk, ground floor housing, 2) limited standing, 3) no lifting greater than 10 pounds, 4) no repetitive squatting, 5) no climbing, 6) no walking on wet uneven surfaces, 7) no work around machines with moving parts, 8) no work in direct sunlight, 9) no temperature extremes, 10) no humidity extremes, 11) no food service work, 12) sedentary work only, 13) consult a representative of the medical department prior to disciplinary action, and 14) special transportation (i.e. transportation other than 'chain' bus). At times, he has been issued special medical passes for 1) slow eating (extra time for meal consumption), 2) slow walking, 3) compression stockings, 4) miscellaneous in-cell medical supplies (e.g. bandages, urinary catheters), 5) assistive mobility devices (e.g. cane, walker/rollator), and 6) security restraint limitations (e.g. no short cuff behind the back, no left leg cuff or restraint, no leg irons).

*Id.* at 4–5 (citation modified).

On the issues of compression stockings, Plaintiff states: (1) he first received them sometime in late 2020, but they were too tight on his leg and caused extra pain; (2) on or about June 24, 2021, during the TDCJ's intake process, a nurse practitioner reordered compression stockings for Plaintiff; (3) Plaintiff never received the reordered stockings and arrived without them at the McConnell Unit on October 1, 2021; and (4) Plaintiff did not receive his second compression stockings until December 13, 2023. (D.E. 93, p. 26–28). Plaintiff's medical records show that: (1) Plaintiff was issued a medical pass for compression stockings on November 17, 2020, for 365 days; (2) Plaintiff's compression stockings were reordered on May 24, 2021; (3) Plaintiff's medical pass for compression stockings was discontinued on April 7, 2022, for 365 days; and (4)

Plaintiff was issued a medical pass for compression stockings on December 13, 2023, for 365 days. (D.E. 86, p. 242–43).

b. Heat -related medical history

During Plaintiff's intake screening on June 22, 2021, and physical examination two days later, Plaintiff's potential heat stress factors were identified as: (1) cardiovascular hypertension; (2) diabetes; and (2) the antihypertensive drug amlodipine/Norvasc. (D.E. 86, p. 33, 60). Dr. Adams states that Plaintiff's mental health status was not considered a risk factor for heat illness because he was not taking any mental health medications linked to heat stress, he was not exhibiting psychomotor agitation, and he was fully aware of the symptoms and risks of heat stress. *Id.* at 34. Likewise, according to Dr. Adams, Plaintiff's history of seizures did not place him at an increased risk of heat sensitivity because he had not had a seizure in at least three years and was not on any antiseizure medication. *Id.*

During the summer of 2022, Plaintiff submitted multiple SCRs complaining that he was not receiving appropriate accommodations (e.g., air-conditioned housing, respite, ice water, frequent showers) and medical treatment to properly address increased heat stress caused by his diabetes, hypertension, and mental illness. (D.E. 86, p. 34). Dr. Adams states that Plaintiff repeatedly claimed: "(1) he had to constantly fight to stay hydrated; (2) was unable to sweat or sweat 'properly'; (3) was unable to stand, walk, or lift without feeling chest pain; (4) was fatigued; (5) felt like he would lose coordination and fall over; (6) felt dizzy; (7) was unable to concentrate, think, or read; (8) was having heat cramps; (9) was having difficulty breathing and could not catch his breath; (10) was suffering lightheadedness and heart palpitations; and (11) was unable to thermoregulate." *Id.* Specifically, during this time period, Plaintiff submitted the following SCRs and received the following medical attention for heat-related complaints:

- May 9, 2022 – Plaintiff submitted several SCRs in which he asked, in part, that security staff be informed he required respite from heat and that security be notified to change his housing assignment due to his medical "excessive heat" restrictions. (D.E. 86, p. 14, 534, 536). Clinical notes reflect that when he was offered an EKG and blood work to address his complaints of chest pains made worse by the heat, Plaintiff refused and wanted to see the doctor and not the nurse. *Id.* at 539. Clinical notes further show that Plaintiff was not in acute distress and that his vital signs were normal. *Id.*

- May 12, 2022 – Plaintiff submitted two SCRs in which he requested respite and for security to change his housing assignment due to his medical heat restrictions. *Id.* at 15, 564–65. Plaintiff was seen that day by a nurse practitioner. *Id.* at 15, 573. Clinical notes reflect that Plaintiff complained of chest pain and shortness of breath due to the heat. *Id.* at 569. After noting that Plaintiff's vital signs were normal, the nurse practitioner ordered blood work for Plaintiff as well as a diabetic diet. *Id.* at 15, 571.

- May 15, 2022 – Plaintiff is seen cell-side by a nurse due to his various complaints of heat intolerance. *Id.* at 15, 575. Plaintiff, however, reported no current complaints of chest pain. *Id.* at 575. Clinical notes reflect that Plaintiff was not in active or acute distress, that his vital signs were within normal limits, and that his respirations were equal and unlabored. *Id.*

- May 16, 2022 – Plaintiff submitted a SCR reporting that he has complications from excessive heat including shortness of breath, tight chest, dizziness, unable to sweat, palpitations, and heat cramps. *Id.* at 16, 585. The nurse screening Plaintiff's SCR notes that Plaintiff had been seen for an evaluation the previous day. *Id.*

- May 30, 2022 – Plaintiff submitted a SCR complaining that he was unable to sweat properly due to the excessive heat conditions couple with his diabetes, that he was unable to stand walk, or lift without feeling chest pain, that he was having trouble sleeping in the heat, that the heat is aggravating his hypertension, and that he is experiencing palpitations and lightheadedness. *Id.* at 17. Clinical notes reflect that Plaintiff's vital signs were within normal limits, that Plaintiff denied any current chest pain with the examining nurse, that he asked to see a doctor and not the nurse, and that he refused to cooperate with the nurse by refusing to answer questions. *Id.* at 612.

- June 2, 2022 – Plaintiff submitted a SCR in the morning in which he complained that the excessive heat was aggravating his pre-existing medical conditions. *Id.* at 17, 622. Plaintiff further complained that he could not hydrate, that his vision was blurry, that he was unable to sweat properly due to his diabetes, that he was unable to stand without feeling chest pain and fatigue, and that he was dizzy and having trouble concentrating, thinking, or reading. *Id.* Clinical notes reflect that Plaintiff's vital signs were within normal limits, that he was not suffering from any of the

symptoms stated in his SCR, that he was denied respite by security, and that he wanted to see the medical provider for his symptoms. *Id.* at 624.

- June 5, 2022 – Plaintiff is seen by a nurse for prior complaints in a SCR related to excessive heat conditions and diabetes. *Id.* at 18, 630. Plaintiff further states that "he is supposed to be heat restricted and not on the building that he is on." *Id.* at 630. He asks to be moved to a cooler environment. *Id.* Clinical notes reflect that Plaintiff walked into medical with a strong and steady gait and that he was not currently suffering from the symptoms mentioned in his SCR. *Id.*

- June 6, 2022 – Plaintiff submitted two SCRs, in which he: (1) reiterated his prior heat-related concerns and symptoms; and (2) states he is unable to take advantage of respite available to him due to his disabilities. *Id.* at 18, 634–35. Plaintiff stated in one of the SCRs that the respite area is a small holding cell and that he is unable to sit, stand, bend, and stoop without pain for even a short amount of time due to his lateral pelvic tilt. *Id.* at 634. Dr. Kwarteng answered Plaintiff's SCRs in writing that Plaintiff has been assigned the appropriate medical restrictions which consist of: (1) lower bunk, ground floor housing; (2) sedentary work only; (3) no climbing; (4) no work in direct sunlight; (5) no temperature extremes; (6) no humidity extremes; and (7) no work around machines with moving parts. *Id.* at 18, 42–43, 231–33, 634–35.

- June 11, 2022 – Plaintiff submitted three SRCs in which Plaintiff complained that he was experiencing extreme heat-related symptoms such as chest pains, shortness of breath, and heat cramps and that security was not addressing his concerns by providing multiple daily cold showers and sufficient cold drinking water. *Id.* at 19, 640–42. Clinical notes that day reflect that Plaintiff's vital signs were within normal limits, that he had no symptoms during his examination, that he was in no acute distress, and that his respirations were equal and unlabored. *Id.* at 644. The examining nurse instructed Plaintiff "to consult with security regarding respite due to current restrictions in place for heat related complaint and medical has no designation for location of respite." *Id.*

- June 12, 2022 – Plaintiff is examined in the medical department by two nurses where he is not found to be in acute distress and that his vital signs were within normal limits. *Id.* at 19, 647. Clinical notes reflect that Plaintiff denied any chest pain, any shortness of breath. *Id.* Plaintiff at first agreed to wanting respite but then indicates he wanted to return to his cell. *Id.*

- June 13, 2022 – Plaintiff submits a SCR on June 13, 2022, complaining in part of heat-related complications and mandating he be seen by a medical provider. *Id.* at 20, 656.

- June 16, 2022 – Plaintiff is seen in medical on June 16, 2022 regarding his heat-related complaints. (D.E. 86, p. 20); (D.E. 86-1, p. 3). Clinical notes reflect that: (1)

Plaintiff's vital signs were within normal limits; (2) his respirations were equal and unlabored; (3) Plaintiff voiced no current complaint, distress, or shortness of breath; and (4) he did not seek respite at that moment but wanted respite the next morning. *Id.*

- June 18, 2022 – Following the submission of several SCRs, Plaintiff is seen by a nurse in medical regarding multiple issue including heat-related complaints for shortness of breath, chest pain, and palpitations. (D.E. 86, p. 20); (D.E. 86-1, p. 15). Clinical notes reflect Plaintiff's verbal reply that he did not want to see the nurse. (D.E. 86-1, p. 15). Clinical notes further reflect that Plaintiff refused having his vital signs taken, that he was in no acute distress, that his respirations were equal and unlabored, and that he refused to answer questions about respite. *Id.*

- June 21, 2022 – Plaintiff submits an SCR requesting Dr. Kwarteng to meet his "heat restrictions" needs and for Warden Sanchez to transfer Plaintiff to another unit which can meet his "heat restriction" needs. (D.E. 86, p. 21); (D.E. 86-1, p. 22). A nurse meets Plaintiff cell-side to address Plaintiff's requests and complaints in his SCR of chest pain, circulatory issues, and shortness of breath. (D.E. 86-1, p. 24). Clinical notes reflect that Plaintiff's vital signs were within normal limits, that he was in no acute distress, and that his respirations were equal and unlabored. *Id.* The nurse referred Plaintiff to a medical provider for evaluation of his restrictions. *Id.*

- June 23, 2022 – Plaintiff submitted several SCRs to Dr. Kwarteng in which he requested review of his medical restrictions and passes, including those related to heat restrictions. (D.E. 86-1, p. 30–33). Clinical notes reflect that Plaintiff is seen by a nurse on June 23, 2022, who reports that Plaintiff had no current complaints, that Plaintiff requested to go to respite after he eats, that he was in no acute distress, and that his respirations were equal and unlabored. *Id.* at 35. Dr. Kwarteng responded in writing to one of Plaintiff's June 23, 2022 SCRs, explaining: "You have all the medical restrictions based on your medical and other conditions. The medical department does not assign inmates to specific housing areas." (D.E. 86, p. 43); (D.E. 86-1, p. 32).

- June 26, 2022 – Plaintiff submitted two SCRs complaining that the heat in the housing area prevents him from exercising and accessing the medical department for insulin injections. (D.E. 86, p. 22); (D.E. 86-1, p. 47–48). A nurse responds in writing to one of the SCRs, explaining: "You are provided … insulin management[,] and current heat restrictions are applicable for respite. Medical is provided 24/7 days. Request respite with security or even during insulin." (D.E. 86-1, p. 48). A nurse responded to the other SCR, explaining "current heat restrictions are appropriate and refer to security for respite." *Id.* at 47.

- July 6, 2022 – Plaintiff submitted a SCR directed to Dr. Kwarteng, listing symptoms related to heat stress due to the extreme temperatures in his housing area.

(D.E. 86, p. 23, 43). Dr. Kwarteng responds in writing: "You have all the heat restrictions. You can always ask for respite." *Id.*

- July 12, 2022 – Plaintiff is seen by a nurse in the 8 Building for complaints of heat-related symptoms which exacerbated his medical conditions. (D.E. 86, p. 24); (D.E. 86-1, p. 82). Clinical notes reflect that Plaintiff was in no acute distress and that his care was terminated due to Plaintiff's aggressive behavior. (D.E. 86-1, p. 82).

- July 13, 2022 – Plaintiff submitted a SCR complaining of his inability to exercise in the heat. (D.E. 86, p. 24); (D.E. 86-1, p. 90). The nurse reviewing the SCR advises Plaintiff that exercise in the morning can be dangerous, that Plaintiff should try to exercise either in the early morning or late afternoon/evening, and that he should stay well hydrated. (D.E. 86, p. 24).

- July 14, 2022 – Plaintiff submitted two SCRs complaining that he is not receiving cold water and/or cold showers. (D.E. 86, p. 24, 43); (D.E. 86-1, p. 97–98). Nursing staff responded to one of the SCRs, explaining that Plaintiff's complaints involve security issues which should be addressed with security. (D.E. 86-1, p. 97). The second SCR was forwarded to Dr. Kwarteng, who responded: "Medical Dep't does not control 'respite.' Please direct your concerns to TDCJ." *Id.* at 98.

- July 18, 2022 – Plaintiff submitted a SCR to medical and directed to Dr. Kwarteng, complaining of excessive heat in the living areas, numerous heat-related symptoms, and exacerbation of his chronic diseases. (D.E. 86, p. 24); (D.E. 86-1, p. 107). Nursing staff reviewed Plaintiff's SCR, writing that Plaintiff had refused to be evaluated. *Id.* Clinical notes reflect that Plaintiff was seen in medical by the nurse for his heat-related complaints. (D.E. 86-1, p. 105). These notes reflect that Plaintiff was in no acute distress and that Plaintiff walked away with security after refusing treatment and to be seen further. *Id*

- August 2, 2022 – Plaintiff submitted a SCR to medical and directed to Dr. Kwarteng, complaining of excessive heat in the living areas, numerous heat-related symptoms, and exacerbation of his chronic diseases. (D.E. 86, p. 25, 43); (D.E. 86-1, p. 151). Dr. Kwarteng responds in writing as follows: "1. You have heat restrictions[.] 2. You can also ask to be taken out for respite[.] 3. Stay hydrated[.]" (D.E. 86-1, p. 151).

In reviewing Plaintiff's medical records related to his 2022 summer SCRs, Dr. Adams found that Plaintiff had denied heat-related symptoms at the time he was examined in medical or cell-side in his housing area and did not exhibit signs of heat-related illness. (D.E. 86, p. 34). She explains:

> He was always alert and oriented and never appeared in acute distress or short of breath. There are many documented observations that his gait was strong and steady as he ambulated into the medical department for his FSBS/insulin clinics or other appointments.

*Id.*

Correctional Managed Health Care Policy D-27.2 ("CMHC D-27.2") defines three heat stress illnesses resulting from overexposure to, or overexertion in, excess temperatures: (1) heat cramps; (2) heat exhaustion; and (3) heat stroke. (D.E. 86-1, p. 399). Heat exhaustion "usually develops following strenuous exercise, in muscles that have been subjected to extensive work. *Id.* Pain from heat cramps is "brief, intermittent and crampy, and may be quite severe." *Id.* CMHC D-27.2 further notes that "[h]eat cramps usually occur after several hours of work, and may occur even at low ambient temperatures." *Id.* Dr. Adams noted that Plaintiff was not required to work and he never exhibited signs of muscle spasms. *Id.* (D.E. 86, p. 35).

Heat exhaustion, which is the most common type of heat stress, is "caused by depletion of water and salt." (D.E. 86-1, p. 399). CMHC D-27-2 further provides that:

> Symptoms include weakness, anxiety, fatigue, thirst, dizziness, headache, nausea and urge to defecate. Signs include profuse perspiration, rapid pulse, incoordination and confusion. Heat prostration may lead to heat syncope, a sudden onset of collapse that is usually of brief duration. During heat syncope the patient appears ashen gray and skin is cool and clammy. Failure to treat heat exhaustion may result in progression to heat stroke.

*Id.* Upon reviewing Plaintiff's medical records, Dr. Adams concluded that:

- based on the volume and content of Plaintiff's SCRs. His claims of being unable to think, concentrate, or read to be highly improbable;
- Plaintiff never complained of excessive or profuse sweating, and there is no documentation of Plaintiff "exhibiting profuse sweating consistent with heat exhaustion or absent sweating indicative of more serious illness";
- there is medical documentation that Plaintiff exhibited "a rapid pulse, incoordination or confusion"; and

- Plaintiff did not complain in his SCRs of headache, vomiting, profound weakness, or urge to defecate.

(D.E. 86, p. 35–36).

Finally, heat stroke constitutes a medical emergency. (D.E. 86-1, p. 399) CMHC D-27.2 provides that:

> While it may be preceded by signs of heat exhaustion, the onset is often sudden. In heat stroke the body has lost its ability to dissipate heat and maintain a normal body temperature. Body temperature is often elevated over 106° F. Exertional heat stroke occurs in young, healthy people who maintain inadequate fluid intake during exertion. Signs include headache, chills, gooseflesh, weakness, incoordination, nausea and vomiting, progressing to unconsciousness. Classical heat stroke is seen in the elderly, those with predisposing medical conditions such as congestive heart failure, diabetes and alcoholism, and those on medications which cause fluid depletion, interfere with sweating or interfere with the body's thermoregulatory system. Classical heat stroke has few premonitory signs. Collapse may be among the first symptoms. Skin is hot and dry, and pulse is rapid and weak. Shock and death may occur in either type of heat stroke.

*Id.* Dr. Adams found no medical documentation that Plaintiff ever lost the ability to thermoregulate or that Plaintiff even suffered a heat-related illness. (D.E. 86, p. 36).

In a Step 1 grievance dated April 17, 2023, (Grievance No. 2023093591), Plaintiff complained that he was heat-restricted due to his disabilities and pre-existing medical conditions. (D.E. 93-15, p. 4–5). Plaintiff requested respite in a way to allow him to elevate his leg during respite, including a chair that would properly support his body during respite. *Id.* at 4. Plaintiff complained that the respite area did not allow him the ability to elevate his leg and lacked restroom facilities. *Id.* After citing no wellness checks, Plaintiff further asked to be provided with an air-conditioned cell or be transferred to a facility that can meet his heat-restricted needs. *Id.*

In a response dated June 5, 2023, the reviewing officer found that (1) medical cannot issue passes for things like chairs to elevate legs or for respite; (2) Plaintiff's heat restrictions are specific

to work; (3) Plaintiff does not have heat restrictions that would qualify him for a transfer off the unit for a medical condition; (4) Plaintiff was seen by a unit provider on the day the grievance was filed and determined to have no urgent or emergent complaints; and (5) on May 16, 2023, Plaintiff was seen by the medical director for the chronic care clinic where it was determined Plaintiff had no urgent or emergent complaints. *Id.* On July 5, 2023, Plaintiff's Step 2 grievance (Grievance No. 2023093591) was denied on the basis that: (1) Plaintiff did not meet the criteria for air-conditioned housing as his Heat Sensitivity Index was zero; (2) Plaintiff's heat restrictions are work restrictions and not life restrictions; and (3) the medical department has no purview over security issues. *Id.* at 7.

Dr. Adams confirmed that UTMB staff, including Dr. Kwarteng "have no authority to determine custody levels or the location of respite areas." (D.E. 86, p. 46). Medical records further show that Plaintiff submitted one SCR during the summer of 2023 as follows:

> August 17, 2023 – Plaintiff submitted a SCR, complaining that his repeated requests to be escorted to respite in air-conditioned environment have been denied due to understaffing and that he continues to suffer various heat-related symptoms. (D.E. 86-1, p. 534). Plaintiff requested to be placed on medications to control symptoms during excessive heat hours while the unit is understaffed. *Id.* Dr. Kwarteng responded in writing: "There are no known medications to prescribe to be used only during 'excessive heat hours.' I am also not aware of any specified 'excessive heat hours.' Please avail yourself of the TDCJ heat mitigation measures as needed." *Id.*

In finding Dr. Kwarteng's advice to be correct, Dr. Adams explains:

> Prevention and treatment for any heat-related illness is to reduce activity, cool the body, and replace lost fluids (i.e. hydrate). Unnecessary medications should be avoided due to the risk of drug-drug interactions and the possibility of compounding the risk for a serious heat-related illness. Necessary medications should be continued unless there is a sound clinical reason to change a patient's treatment plan. While the drug amlodipine/Norvasc used

> to treat [Plaintiff's] hypertension is considered a potential risk factor for heat illness, it is one of the safer antihypertensive medications in that it is less likely than diuretics to cause dehydration and electrolyte imbalances, and less likely than beta blockers to reduce cardiac output, blood flow to the skin, and the ability to sweat efficiently.

(D.E. 86, p. 47).

### C. Section 1983 Eighth Amendment Deliberate Indifference Claims

*i. Standing*

Defendants argue that Plaintiff lacks standing to bring his deliberate indifference claims against Warden Amonett, Warden Holmes, Warden Sanchez, and Dr, Kwarteng "because there is no evidence that he suffered an actual injury, much less that the injury was caused by" any of these defendants. (D.E. 84, p. 21).

The "irreducible constitutional minimum of standing" under Article III requires the following: (1) a showing of an "injury in fact"; (2) a causal connection between the injury and the alleged conduct; and (3) a likelihood that the injury will be redressed by a favorable decision. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992); *Morgan v. Huntington Ingalls, Inc.*, 879 F.3d 602, 606 (5th Cir. 2018).

The "injury in fact" must be "concrete and particularized" and must also be "actual or imminent" rather than "conjectural or hypothetical." *Lujan*, 504 U.S. at 560 (citation modified). The party invoking federal jurisdiction bears the burden to establish standing. *Id.* at 561. Because "Article III standing implicates the federal judiciary's power to adjudicate disputes," it "can be neither waived nor assumed." *Morgan*, 879 F.3d at 606 (citation modified); *see In re Deepwater Horizon*, 857 F.3d 246, 253 n. 34 (5th Cir. 2017) (explaining standing cannot be inferred, but rather must "affirmatively appear in the record").

Here, Plaintiff has provided competent summary judgment evidence through his statements that he suffered numerous and specific heat-related symptoms due to the failure of Wardens Amonett, Holmes, and Sanchez to put into place certain policies related to access to space on respite visits, wellness checks, lack of access to respite, and the conditions of the 3 x 3-foot holding cell when he was granted access to respite. (D.E. 10, p. 6–7, 12–13, 17). The competent summary judgment evidence further reflects that, in the summer of 2022, Plaintiff's submitted numerous sick call requests to the attention of Dr. Kwarteng in which he complained about the excessive heat conditions and reported numerous heat-related symptoms. (D.E. 10, p. 14, 18); (D.E. 86, p. 14–25, 43). Plaintiff then attests that, while responding to five SCRs in writing, Dr. Kwarteng never performed any examination on Plaintiff or provided any treatments addressing his heat-related symptoms. (D.E. 10, p. 15–16).

On the issue of standing, the Court finds that Plaintiff has successfully alleged actual, concrete injuries in fact caused by the excessive heat conditions at the McConnell Unit, the alleged policies implemented by Wardens Amonett, Holmes, and Sanchez, and the actions or inactions of Dr. Kwarteng. *Cf. Taylor v. Collier*, No. 3:17-CV-358, 2019 WL 1383021, at *5 (S.D. Tex. Mar. 27, 2019) (Hanks, J.) (concluding that defendants were entitled to summary judgment on the issue of standing where inmate failed to allege that he has suffered any symptoms because of the heat at the Terrell Unit, that he took medications that increased his heat sensitivity, or that the specific medical episode was heat-related). Accordingly, Defendants are not entitled to summary judgment on the issue of standing.

*ii. Qualified Immunity*

Defendants contend that they are entitled to qualified immunity with respect to Plaintiff's Eighth Amendment claims against them in their respective individual capacities. (D.E. 84, p. 28–

30).

The defense of qualified immunity protects government officials from personal liability for monetary damages "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). In other words, an official is liable in their individual capacity only if the official's particular conduct: (1) "violated a statutory or constitutional right," and (2) "the right was clearly established at the time of the violation," such that "[t]he contours of the right are sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Ford v. Anderson Cnty., Tex.*, 102 F.4th 292, 307 (5th Cir. 2024) (citation modified).

Importantly, "a good-faith assertion of qualified immunity alters the usual summary judgment burden of proof, shifting it to the plaintiff to show that the defense is not available." *Ratliff v. Aransas Cnty., Tex.*, 948 F.3d 281, 287 (5th Cir. 2020) (citation modified). Accordingly, once a defendant invokes qualified immunity, "the plaintiff must rebut it by establishing (1) that the [defendant] violated a federal statutory or constitutional right and (2) that the unlawfulness of the conduct was 'clearly established at the time.'" *Rich v. Palko*, 920 F.3d 288, 294 (5th Cir. 2019) (quoting *District of Columbia v. Wesby*, 583 U.S. 48, 63 (2018)). "At the summary-judgment stage, [a plaintiff] may not rest on mere allegations or unsubstantiated assertions but must point to specific evidence in the record demonstrating a material fact issue concerning each element of his claim." *Mitchell v. Mills*, 895 F.3d 365, 370 (5th Cir. 2018).

Because Defendants have asserted their right to qualified immunity, Plaintiff has the burden to "rebut the defense by establishing that [their] allegedly wrongful conduct violated clearly established law and that genuine issues of material fact exist regarding the reasonableness of [their] conduct." *Gates v. Tex. Dep't of Protective & Regul. Servs.*, 537 F.3d 404, 409 (5th Cir. 2008). As

discussed above, a government official's conduct violates clearly established law when, at the time of the challenged conduct, "the contours of the right are sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Ford*, 102 F.4th at 307 (citation modified). A binding court case directly on point is not required, but "existing precedent must have placed the statutory or constitutional question beyond debate." *Id.*; *see also Malley v. Briggs*, 475 U.S. 335, 341 (1986).

"Abstract or general statements of legal principle untethered to analogous or near-analogous facts are not sufficient to establish a right 'clearly' in a given context; rather the inquiry must focus on whether a right is clearly established as to the specific facts of the case." *Vincent v. City of Sulphur*, 805 F.3d 543, 547 (5th Cir. 2015) (citing *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004)). Absent controlling authority, there must be a "robust 'consensus of cases of persuasive authority.'" *Ashcroft*, 563 U.S. at 741 (quoting *Wilson v. Layne*, 526 U.S. 603, 617 (1999)). The controlling decision or consensus must be with regard to the official's "*particular* conduct," described with specificity. *Harmon v. City of Arlington, Tex.*, 16 F.4th 1159, 1166 (5th Cir. 2021) (quoting *Mullenix v. Luna*, 577 U.S. 7, 12 (2015) (per curiam)). The second step of the qualified immunity inquiry is judged against the backdrop of the law at the time of the conduct. *Morgan v. Chapman*, 629 F. Supp.3d 616, 630 (S.D. Tex. 2022) (Tipton, J.) (citing *Kisela v. Hughes*, 584 U.S. 100, 104 (2018).

Courts have discretion to decide the order in which to consider the two-prong inquiry when determining whether qualified immunity is warranted. *See Pearson v. Callahan*, 555 U.S. 223, 236 (2009) ("The judges of the district courts and the courts of appeals should be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand."); *Cleveland*

*v. Bell*, 938 F.3d 672, 676 (5th Cir. 2019) ("If the plaintiff fails at either step, the federal court can grant qualified immunity by addressing either step or both of them.").

Section 1983 provides a vehicle for redressing the violation of federal law by those acting under color of state law. *Nelson v. Campbell*, 541 U.S. 637, 643 (2004). To prevail on a § 1983 claim, the plaintiff must prove that a person acting under the color of state law deprived him of a right secured by the Constitution or laws of the United States. 42 U.S.C. § 1983; *West v. Atkins,* 487 U.S. 42, 48 (1988). A defendant acts under color of state law if he misuses or abuses official power and if there is a nexus between the victim, the improper conduct, and the defendant's performance of official duties. *Townsend v. Moya,* 291 F.3d 859, 861 (5th Cir. 2002).

"Personal involvement is an essential element of a civil rights cause of action." *Thompson v. Steele*, 709 F.2d 381, 382 (5th Cir. 1983). There is no vicarious or respondeat superior liability of supervisors under § 1983. *Thompkins v. Belt*, 828 F.2d 298, 303–04 (5th Cir. 1987); *see also Carnaby v. City of Houston*, 636 F.3d 183, 189 (5th Cir. 2011) (explaining the acts of subordinates do not trigger individual § 1983 liability for supervisory officials). "Each Government official, his or her title notwithstanding, is only liable for his or her own misconduct." *Iqbal*, 556 U.S. at 677. A plaintiff "must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Id.* at 676.

Thus, a supervisory official may be held liable only if "(1) he affirmatively participates in the acts that cause the constitutional deprivation, or (2) he implements unconstitutional policies that causally result in the constitutional injury." *Porter v. Epps*, 659 F.3d 440, 446 (5th Cir. 2011). Supervisory liability without overt personal participation in the offensive act thus can lie only if the supervisory official "implement[s] a policy so deficient that the policy itself is a repudiation of constitutional rights and is the moving force behind the constitutional violation." *Thompkins*, 828

F.2d at 304 (internal quotations omitted). "A policy is normally an official statement, ordinance, or regulation, but in certain circumstances a persistent, widespread practice that is so commonplace as to constitute a custom can also be treated as policy." *McNeil v. Caruso*, No. 17-01688, 2019 WL 1435831, at *2 (M.D. La. Mar. 28, 2019) (Jackson, J.) (citing *Piotrowski v. City of Houston*, 237 F.3d 567, 579 (5th Cir. 2001)).

The Eighth Amendment prohibits cruel and unusual punishment. U.S. Const. amend. VIII. "The Constitution does not mandate comfortable prisons . . . but neither does it permit inhumane ones, and it is now settled that the treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment." *Harper v. Showers*, 174 F.3d 716, 719 (5th Cir. 1999) (quoting *Woods v. Edwards*, 51 F.3d 577, 581 (5th Cir. 1995) (per curiam) (citation modified)). An Eighth Amendment violation occurs when a prison official acts with deliberate indifference to an inmate's health and safety. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994).

"Deliberate indifference is an extremely high standard to meet." *Domino v. Tex. Dep't of Crim. Just.*, 239 F.3d 752, 755 (5th Cir. 2001). The test for deliberate indifference has both an objective and subjective prong. *Id.* at 839. Under the objective prong, the inmate must first prove "an objective exposure to a substantial risk of harm." *Valentine v. Collier*, 993 F.3d 270, 281 (5th Cir. 2021). "Inmates need not show that death or serious injury has already occurred to prove that unconstitutional conditions exist under the objective element . . . rather, they need only show that there is a substantial risk of serious harm." *Garrett v. Lumpkin*, 96 F.4th 896, 900–01 (5th Cir. 2024) (citation modified). Under the objective prong, therefore, Plaintiff need not show actual harm to his health based on the purported excessive heat conditions in his cell. *Id.* at 901.

To prove the subjective prong of the deliberate indifference test, an inmate must establish that the prison official "had subjective knowledge that the inmate faced a substantial risk of harm [to the inmate's health and safety] and . . . [consciously] disregarded the risk." *Valentine*, 993 F.3d at 281; *see also Lawson v. Dall. Cnty.*, 286 F.3d 257, 262 (5th Cir. 2002). A prison official's knowledge of a substantial risk may be inferred if the risk was obvious. *Easter v. Powell*, 467 F.3d 459, 463 (5th Cir. 2006). The Fifth Circuit has "consistently recognized . . . that 'deliberate indifference cannot be inferred merely from a negligent or even a grossly negligent response to a substantial risk of serious harm.'" *Dyer v. Houston*, 964 F.3d 374, 381 (5th Cir. 2020) (quoting *Thompson v. Upshur Cnty., Tex.*, 245 F.3d 447, 458–59 (5th Cir. 2001)); *see also Aguirre v. City of San Antonio*, 995 F.3d 395, 420 (5th Cir. 2021) ("Negligence or even gross negligence is not enough, the officials must have actual knowledge of the substantial risk"). The Supreme Court further explains that "an official's failure to alleviate a significant risk that he should have perceived but did not" falls short of constituting deliberate indifference. *Farmer*, 511 U.S. at 838. Deliberate indifference encompasses only unnecessary and wanton infliction of pain repugnant to the conscience of humankind. *McCormick v. Stalder*, 105 F.3d 1059, 1061 (5th Cir. 1997) (citations omitted).

a. Plaintiff's Claims against Wardens Amonett, Holmes and Sanchez (Policies Put in Place or Continued)

Extreme temperatures in prison can violate the Eighth Amendment. *Yates v. Collier*, 868 F.3d 354, 360 (5th Cir. 2017); *Ball v. LeBlanc*, 792 F.3d 584, 592 (5th Cir. 2015); *Gates v. Cook*, 376 F.3d 323, 333 (5th Cir. 2004). The Fifth Circuit has held that inmates have a right under the Eighth Amendment not to be subjected to extreme temperatures without adequate remedial measures. *See Hinojosa v. Livingston*, 807 F.3d 657, 670 (5th Cir. 2015) (citing *Gates*, 376 F.3d

at 339–40). "[W]e have repeatedly recognized the serious risk of harm that excessive heat can pose in the prison context absent adequate mitigating measures, and we have consistently found evidence sufficient in these cases to support an Eighth Amendment violation, even when certain mitigating measures were available." *Yates*, 868 F.3d at 361; *see also Ball*, 792 F.3d at 596 (affirming "district court's conclusion that housing these prisoners in very hot cells without sufficient access to heat-relief measures, while knowing that each suffers from conditions that render him extremely vulnerable to serious heat-related injury, violates the Eighth Amendment").

The Court has retained Plaintiff's Eighth Amendment deliberate indifference claims against Wardens Amonett, Holmes, and Sanchez in their individual capacities for putting into place or continuing policies: (1) limiting wellness checks; (2) providing inadequate space for inmates like Plaintiff requesting air-conditioned respite; (3) inadequately staffing a sufficient number of escorts for Plaintiff to access respite upon request (4) placing G5 inmates like Plaintiff in a restrictive location (3 x 3-foot holding cell ) for respite; and (5) denying respite for G5 inmates like Plaintiff altogether. (D.E. 16, pp. 71–72; D.E. 46, pp. 1–3). To establish an Eighth Amendment violation in this case, Plaintiff must show that the excessive heat conditions at the McConnell Unit posed an unreasonable risk of harm to him (objective prong) and that Defendants acted with deliberate indifference to the risk posed. *Hinojosa*, 807 F.3d at 669; *see also Webb v. Livingston*, 618 F. App'x 201, 208–09 (5th Cir. 2015) (affirming holding that inmates with heat-sensitive medical conditions who were housed in cells where the temperature exceeded 100 degrees had asserted facts that, if proven, would overcome qualified immunity).

Before analyzing whether Plaintiff can satisfy the objective and subjective components of his deliberate indifference claims against the former senior wardens, the Court will consider the impact of a recent decision from the Western District of Texas. In *Tiede v. Collier*, 796 F. Supp.3d

275 (W.D. Tex. 2025) (Pitman, J.), the court considered a motion for preliminary injunction filed by Texas inmate Bernhardt Tiede ("Tiede") and various supporting organizational groups. *Id.* at 281. Tiede alleged in his original complaint that (1) he suffered from multiple health conditions, including diabetes, hypertension, and COPD; (2) while housed in a cell without air conditioning, "he suffered stroke symptoms that were exacerbated by heat and necessitated transportation to an emergency room"; and (3) "fans and periodic deliveries of ice water and cold cloths were insufficient to provide relief from temperatures that exceed 110 degrees Fahrenheit in cells." *Id.* After an extensive evidentiary hearing was conducted, the court found in pertinent part:

- despite being 65 years old and having multiple medical conditions making him vulnerable to the heat, Tiede was housed in an unair-conditioned cell in which temperatures regularly reached above 100 degrees during the summer of 2023;

- "[d]espite his various heat-sensitive co-morbidities," Tiede was not given a heat score that qualified him for air-conditioned housing;

- heat is considered to be one of the leading weather-related killers in the United States, resulting in hundreds of fatalities each year;

- Texas summer temperatures have trended warmer with increasing heat indexes;

- "inmate housing areas in Texas's unair-conditioned prisons are unreasonably dangerous due to the extreme heat during the summer months";

- at least 23 individuals have died in TDCJ facilities between 1998 and 2012 from heat-related causes;

- TDCJ's heat score system is arbitrary, inadequate, and ineffective;

- respite areas available to inmates are inadequate and ineffective based on the temporary nature of the respite, the lack of sufficient access due to understaffing, and an inmate's particular security level;

- cold showers fail to protect against the health risks of constant extreme heat as they are often unavailable, denied by staff, and work only during the time an inmate is wet; and

- access to cold water is often inconsistent and does not serve to reduce the long-term effects of excessive heat.

*Id.* at 288–314.

Based on the evidence presented, the court determined that plaintiffs would likely succeed on the merits of their Eighth Amendment claims. *Id.* at 324. The court concluded that the organizational plaintiffs had shown "that extreme heat in TDCJ's uncooled prisons constitutes a well-established substantial risk of serious harm that constitutes cruel and unusual punishment." *Id.* at 325–27. In considering the evidence of numerous heat-related deaths and illnesses occurring among the inmates and staff in the summers of 2022 and 2023, the court determined:

> Notably, these deaths and heat-related illnesses and injuries occurred during a summer when, as [TDCJ Director] Collier's witnesses testified and TDCJ documents indicate, the prisons were implementing all of TDCJ's heat mitigation measures, including their heat score system, access to cooled respite areas, distribution of water and ice, cool showers, and fans. TDCJ's mitigation measures are ineffective because of the temporary nature of the relief. And in some instances, such as using fans when the temperature reaches a certain threshold, the mitigation measures actually increase the risk of heat-related illness, injury, or death. And even if the mitigation measures were effective, inmates have severely limited access to these resources due to understaffing. Based on this evidence, Plaintiffs have shown that every TDCJ inmate in an unair-conditioned cell faces a substantial risk of death or serious bodily injury from the extreme heat, absent the installation of air conditioning.

*Id.* at 326–27.

The court noted that Tiede was substantially likely to prove his Eighth Amendment claim due to his enhanced sensitivity to extreme heat. *Id.* at 327. With regard to the subjective standard of the deliberate indifference test, the court concluded that the plaintiffs demonstrated it was likely

that Collier knew inmates faced serious harm from the extreme heat in Texas's unair-conditioned prisons, that the risk was obvious and well documented, and that he could not rely on heat-mitigation efforts known to be inadequate to reduce the risk or otherwise assure the well-being of inmates and prison officials.[9] *Id.* at 328–32.

The Court now turns to consider whether Plaintiff can satisfy the objective prong of deliberate indifference by showing that the summer heat conditions in 2022 and 2023 exposed him to a substantial risk of serious harm. Defendants contend that, even assuming he was denied respite or wellness checks on occasion, no competent summary judgment evidence has been presented to show that Plaintiff's conditions of confinement posed an unreasonable risk of serious damage to his future health. (D.E. 84, p. 25).

Plaintiff responds that he suffers from conditions (obesity, diabetes, cardiovascular disease such as hypertension and arteriosclerosis, and psychiatric conditions) rendering him susceptible to serious heat-related conditions. (D.E. 93, p. 35–38). Plaintiff contends further that certain medications he takes for his condition also impede his ability to thermoregulate, thereby increasing the likelihood of heat-related illness. *Id.* at 38.

The competent summary judgment evidence shows that heat mitigation measures set forth under AD-10.64 require in pertinent part:

- offenders are entitled to request access to a respite area 24 hours per day, seven days per week;

[9] After finding that TDCJ inmates housed in unair-conditioned housing were at risk of experiencing irreparable harm, the court nevertheless determined that it could not grant the relief requested of temporary air conditioning for TDCJ inmates because the granting of such relief would alter the "status quo to make it *less* feasible to attain a permanent injunction after this case proceeds to a bench trial and final judgment." *Tiede*, 796 F.Supp.3d at 334. The court then emphasized its "anticipation that [p]laintiffs will ultimately succeed on the merits" and warned Executive Director Collier "that it foresees Plaintiffs being entitled to permanent relief in the form of expeditious installation of permanent air conditioning in all TDCJ facilities." *Id.* at 336.

- offenders are entitled to request access to a respite area even if they are not feeling ill and are permitted to stay in respite for as long as necessary;

- drinking water and cups must be available to every offender during period of excessive heat with hydration encouraged;

- inmates receiving a heat sensitivity score receive priority placement in a housing areas that is air-conditioned;

- unit staff shall conduct wellness checks on those offenders who are on the Heat Restriction List (applying to those offenders with restrictions related to physical activities, transportation and work);

- unit staff shall immediately seek care for any and all offenders requesting medical care or exhibiting signs of illness, regardless whether they are on the Heat Restriction List.

(D.E. 84-5, p. 3, 5, 7, 10–11). Defendants Wysocki, Amonett, Holmes, and Sanchez reference the following general measures in effect under AD-10.64 at the McConnell Unit at all relevant times:

- inmates may request access to respite areas at any time and are allowed to stay in respite for as long as necessary, all the while being provided cups, cold hydrating drinks, and electrolyte packages;

- inmates are permitted to use the restroom and return to respite if necessary;

- no maximum time was set for how long inmates may stay on respite;

- all inmates, regardless of custody level, are permitted to bring items to respite ordered for them by medical providers, such as compression stockings.

(D.E. 84-1, p. 1–2); (D.E. 84-2, p. 1–2); (D.E. 84-3, p. 1–2); (D.E. 84-4, p. 1–2). These senior wardens each explained that one of their top priorities was to ensure that the respite requirements of AD-10.64 was met. (D.E. 84-1, p. 2); (D.E. 84-2, p. 3); (D.E. 84-3, p. 2); (D.E. 84-4, p. 2).

However, in response, Plaintiff has presented competent evidence to show that remedial measures such as respite and wellness checks were either unavailable, denied to him, or otherwise not provided to him as outlined in AD-10.64. As reflected in Plaintiff's statements, he was denied or delayed access to air-conditioned respite on numerous occasions during the summer of 2022 and 2023 despite suffering from heat-related symptoms when he sought respite. (D.E. 10, p. 5, 17); D.E. 10-1, p. 2–6). Plaintiff further states that, when placed in respite, he was required, as a G5 inmate, to sit in a small holding cell which exacerbated his left leg's condition impacted both by his physical issues and diabetes. (D.E. 6, p. 10); (D.E. 10, p. 7, 12). Plaintiff further states that, despite his placement on the Heat Restriction List, McConnell officers did not perform wellness checks as mandated or ensure that escorts were available at all times when Plaintiff requested respite during the relevant time periods. (D.E. 10, p. 6–7).

The competent summary judgment evidence, as reflected in the objective medical records, shows that Plaintiff, currently 52 years old, has a medical history of:

> 1) hypertension (HTN) diagnosed in 2002, 2) type 2 diabetes mellitus (DM II) diagnosed in 2015, 3) hyperlipidemia (HLD), i.e. elevated cholesterol, triglycerides, and other blood lipids, 4) gastroesophageal reflux disease (GERD), 5) decreased visual acuity requiring reading glasses, 6) alcohol abuse, and 7) mental illness with past diagnoses of major depression, PTSD (post-traumatic stress disorder), and schizophrenia with auditory and visual hallucinations.

(D.E. 86, p. 2–3). The objective medical records further reflect that, following a motor vehicle accident in 1996, Plaintiff suffered a traumatic brain injury resulting in a seizure disorder, a lower left leg deformity, and chronic pain. *Id.* at 3. Plaintiff's potential heat stress factors resulting from these infirmities subsequently were identified as: (1) cardiovascular hypertension; (2) diabetes; and (3) the antihypertensive drug amlodipine/Norvasc. (D.E. 86, p. 33, 60).

Plaintiff's statements further reflect that in the summers of 2022 and 2023, temperatures exceeded 90 degrees from April through October on numerous occasions. (D.E. 93, p. 14). The evidence shows that, while Plaintiff did not have a heat score at the McConnell Unit requiring him to be transferred to an air-conditioned cell, he was given restrictions for no work in extreme heat, humidity and sunlight. (D.E. 10, p. 2); (D.E. 86, p. 18, 42–43, 231–33, 634–35). Documentation submitted as evidence by Plaintiff shows that Plaintiff was on the Heat Restriction List in June 2023. (D.E. 93-9, p. 2–7). Lastly, Plaintiff's statements and objective medical evidence do not confirm that Plaintiff was issued compression stockings or was in possession of them to wear during the summers of 2022 and 2023. (D.E. 93, p. 26–28); (D.E. 86, p. 242–43).

As discussed above, the test for establishing the objective component of deliberate indifference does not require Plaintiff to show actual harm but instead show that there was a substantial risk of serious harm due to the excessive heat conditions in the summers of 2022 and 2023. *See Garrett*, 96 F.4th at 900–01. Here, the evidence indicates that many heat-related measures under AD-10.64 were implemented at the McConnell Unit during the summers of 2022 and 2023. On the other hand, competent summary judgment evidence suggests that certain heat-related remedial measures were not afforded to Plaintiff, who suffers from medical conditions and took at least one medication that made him vulnerable to excessive summer heat conditions. Accordingly, genuine issues of material fact preclude summary judgment for either Plaintiff or Defendants as to whether Plaintiff can show an objective exposure to an unreasonable risk of serious harm, especially in light of evidence that Plaintiff had a heightened level of susceptibility or sensitivity to excessive heat conditions.

The Court now turns to whether Plaintiff can establish the subjective prong—whether Wardens Amonett, Holmes, and Sanchez acted with deliberate indifference to the substantial risk

posed to his health by the excessive heat conditions as a result of policies put into place or continued at the McConnell Unit. Defendants first contend in their summary judgment motion that Warden Sanchez could not have enacted or enforced an unconstitutional policy during the relevant time period because he left the McConnell Unit on September 1, 2021. (D.E. 84, p. 25).

In his declaration, Warden Sanchez states that he worked at the McConnell Unit from June 1, 2021, until September 1, 2021. (D.E. 84-4, p. 1). However, as Plaintiff points out, Defendants' First Supplemental Disclosures indicate that Warden Sanchez worked at the McConnell Unit until September 1, 2022.[10] (D.E. 93-4, p. 3). Plaintiff states in his Amended Complaint that Warden Sanchez served as the Senior Warden at the McConnell Unit during the relevant time period from April 2022 through August 2022. (D.E. 6, p. 12). The Court finds, therefore, that a factual dispute exists as to when Warden Sanchez worked as the McConnell Unit's senior warden sufficient to preclude granting summary judgment in his favor on this issue.

Next, Defendants contend that the evidence does not show each of the senior wardens acting with the requisite subjective deliberate indifference because they "took every possible step in their power to ensure that Plaintiff (along with other inmates) had access to safe and effective heating measures, including unlimited respite." (D.E. 84, p. 25). As for his deliberate indifference claims against each of the senior wardens, Plaintiff responds:

- Warden Sanchez – He was aware of facts from which the inference could be drawn that a substantial risk of serious harm existed for Plaintiff. He further knew that the unit operating at 50% manpower was insufficient for wellness checks, access to air-conditioned respite, and unlimited showers. To support his claim against this defendant, Plaintiff points to: (1) Defendants responding in discovery it was impossible to determine the precise effectiveness of wellness checks; (2)

[10] Defendants' First Supplemental Disclosures further indicate that Warden Holmes worked at the McConnell Unit from September 1, 2022, through July 15, 2023. (D.E. 93-4, p. 3-4). This conflicts with Warden Holmes's statement in his declaration that he served as the McConnell Unit's senior warden from September 1, 2021, through July 1, 2023. (D.E. 84-3, p. 1).

Defendants producing no documents to support that wellness checks were conducted for inmates like Plaintiff on the "Heat Restriction List"; and (3) Defendants producing no "Respite Tracking Forms" to demonstrate that Plaintiff had access to respite. (D.E. 93, p. 39–41).

- Warden Holmes – He was aware of facts from which the inference could be drawn that a substantial risk of serious harm existed for Plaintiff. Contrary to the "respite on demand" policy set forth in AD-10.64, Warden Holmes responded in discovery that inmates may have to wait until space opens before being moved to a respite area. To support his deliberate indifference claim against this defendant, Plaintiff points to: (1) Defendants responding in discovery it was impossible to determine the precise effectiveness of wellness checks; and (2) Defendants responding in discovery that, contrary to AD-10.64, TDCJ officers do not evaluate heat-related illnesses or report heat-related illnesses to unit medical staff or anybody else. *Id.* at 42, 44–47.

- Warden Amonett – He was aware of facts from which the inference could be drawn that a substantial risk of serious harm existed for Plaintiff. Contrary to the "respite on demand" policy set forth in AD-10.64, Warden Amonett, like Wardens Sanchez and Holmes, implemented policies limiting wellness checks, providing inadequate space for inmates like Plaintiff requesting air-conditioned respite, inadequately staffing a sufficient number of escorts for G5 inmates like Plaintiff to access respite and instead placing G5 inmates in overly-restricted locations. *Id.* at 47–50.

Former McConnell Unit Wardens Amonett, Holmes, and Sanchez each stated that an "inmates' access to respite was sometimes delayed or limited due to understaffing, which was a persistent problem across TDCJ" while each warden served as the McConnell Unit's warden. (D.E. 84-1, p. 2); (D.E. 84-2, p. 2); (D.E. 84-3, p. 2); (D.E. 84-4, p. 2). Each warden explained:

- The McConnell Unit operates at below 50% staffing at all relevant times.

- All decisions regarding hiring and allocation of staff across units are made by TDCJ's Security Operations and Assessments Department.

- Therefore, as a Senior Warden, each warden had no power to hire staff to fill shortages.

- The most each senior warden could do was impose mandatory overtime and request temporary assistance from officers at other units—which was frequently done—but these efforts were often limited by employment policies and understaffing at other units.

- Notwithstanding, one of the top priorities as a senior warden was to ensure that the respite requirements of AD-10.64 were met, and each warden made every effort to utilize staff efficiently to do so.

- For example, if there was a limited number of escorting officers available on a hot day, the senior warden instructed the officers to prioritize escorting G4/G5 inmates to and from respite areas, even if doing so means that fewer officers were available to perform less-important (though technically mandatory) duties such as escorting inmates to the library or education building.

- Each warden also instructed officers to prioritize escorting to respite areas inmates who showed signs of heat-related symptoms such as sweating, heavy breathing, or lethargy.

- Based on these and other efforts, none of the senior wardens believed that any inmate was ever denied respite entirely on high-temperature days during his or time as senior warden.

- Rather, at most, inmates' access to respite may have been slightly delayed, or the duration of their respite may be shortened.

- While waiting for respite, inmates always had access to cold water and other heat-mitigation measures outlined in AD-10.64.

- During the summers of 2023 and 2024, G5 inmates like Plaintiff were escorted due to security concerns to the 12 Building for respite where they were placed either in 3 x 3-foot holding cells or legal booths which measure either 3 x 3-feet or 6 x 5-feet.

- G5 inmates were placed in these small holding cells and legal booths because no other air-conditioned areas were available for use without posing serious security concerns.

- Both the holding cells and legal booths contained a stool, and inmates using those areas for respite had access to cold water and bathroom facilities upon request.

- The use of these small respite areas for G5 inmates like Plaintiff was not punitive, and each former senior warden did not believe that placing inmates in those areas for respite posed a risk of harm, especially since inmates only remained in respite areas for short periods of time.

- While every portion of AD-10.64 may not have been followed at times and instances of understaffing may have delayed or limited respite access, each former senior warden did everything in his or her power to ensure compliance with the AD-10.64 and protect inmates from heat-related illness.

- At no point did any of the former senior wardens institute a policy or practice of limiting or prohibiting certain inmates from receiving respite or wellness checks.

(D.E. 84-2, p. 1–3); (D.E. 84-3, p. 1–3); (D.E. 84-4, p. 1–3).

In contrast, Plaintiff states that, from April 2022 through August 2022, his 30 to 50 requests for respite were all denied while Warden Sanchez was the senior warden. (D.E. 6, p. 12). Plaintiff attributes these denials to a policy put in place by the senior warden, presumably Warden Sanchez, where the 200 G5 inmates like Plaintiff were automatically denied respite due to the lack of staff to escort these inmates to respite. (D.E. 10, p. 16). Plaintiff cites over 25 incidents from June 29, 2023, through July 30, 2023, where he was outright denied respite or received respite after various time delays. (D.E. 10-1, p. 2–6). Plaintiff explains that these denials or delays often occurred due to understaffing and the lack of escorts available to take him to 12 Building. *Id.* Defendants were unable to produce any documentation through "Respite Tracking Forms" to show when Plaintiff was granted respite or otherwise indicate how well the respite measures were working at the McConnell Unit. (D.E. 93-3, p. 9).

It is undisputed that Plaintiff's custody status was G5 during the summers of 2022 and 2023. (D.E. 10, p. 1); (D.E. 84-1, p. 3). Whenever Plaintiff was escorted to respite in the 12 Building, he indicates that he was placed in a 3 x 3-foot holding cell. (D.E. 6, p. 10); (D.E. 10, p. 12). According to Plaintiff, this policy hindered his ability to elevate his leg and access the bathroom, which was needed due to his diabetic condition. (D.E. 6, p. 10); (D.E. 10, p. 12). Plaintiff attributes his forced placement in small holding cells to the policies enforced by Wardens Amonett, Holmes, and Sanchez. (D.E. 10, p. 11). Plaintiff states that senior-level wardens (Wardens Amonett, Holmes, and Sanchez) were responsible for ensuring that escorts to respite and adequate space other than small holding cells was available for inmates requesting respite. *Id.* at 7.

Competent summary judgment evidence shows Wardens Amonett, Holmes, and Sanchez as conceding that (1) an inmate's access to respite may be slightly delayed on occasion with the duration in respite shortened; and (2) respite areas had space limitations, which caused on rare occasions for inmates to wait until space opened up before being taken to respite. (D.E. 84-2, p. 3); (D.E. 84-3, p. 4); (D.E. 84-4, p. 4); (D.E. 93-3, p. 17).

On the issue of wellness checks, Plaintiff has presented competent summary judgment evidence showing that he was on the Heat Restriction List, at least in the summer of 2023, but that McConnell Unit officials never performed wellness checks. (D.E. 10, p. 6); (D.E. 93-9, p. 2–7). Plaintiff states that senior-level wardens (Wardens Amonett, Holmes, and Sanchez) were responsible for ensuring that wellness checks were performed for heat-sensitive inmates like Plaintiff under AD-10.64. (D.E. 10, p. 6). No documents were produced by Defendants to show that wellness checks had been performed in a proper manner during the summer months of 2022 and 2023. (D.E. 93-3, p. 8).

Plaintiff further points to another discrepancy between the requirements of AD-10.64 and the heat-mitigation measures implemented at the McConnell Unit. Under AD-10.64, "[security s]taff shall immediately seek care for any and all offenders requesting medical assistance or exhibiting signs of illness, even if they are not listed on the Heat Restriction List." (D.E. 84-5, p. 7). In the "Emergency Treatment" section of AD-10.64, staff is entrusted with monitoring and seeking "care for offenders requesting medical assistance or exhibiting signs of illness during periods of excessive or extreme temperatures." *Id.* at 10. Plaintiff points to competent summary judgment evidence, contrary to these mandates, indicating that TDCJ officers were not charged by supervisory officials at the McConnell Unit with evaluating heat-related illnesses or reporting such illnesses to medical staff. (D.E. 93-3, p. 14).

The gravamen of Plaintiff's deliberate indifference claim against Wardens Amonett, Holmes, and Sanchez is that these senior supervisory officials (1) knew that Plaintiff faced a substantial risk of serious harm due to the excessive heat conditions; and (2) disregarded that risk by failing to take reasonable measures to abate the risk through their policies addressing the excessive heat conditions at the McConnell Unit. "'Whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence, and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious.'" *Ball*, 792 F.3d at 594 (quoting *Farmer*, 511 U.S. at 842).

The competent summary judgment evidence reflects Plaintiff's documentation of the excessive heat conditions in the summer of 2022 and 2023. The *Tiede* court specifically found that excessive heat accounts for hundreds of fatalities per year, that Texas summer temperatures have trended warmer with increasing heat indexes, and that Texas prisons without air conditioning are unreasonably dangerous during the summer months due to the extreme heat. *Tiede*, 796 F. Supp.3d at 290–94. A reasonable inference can be made that Wardens Amonett, Holmes, and Sanchez were likewise well aware of the risk posed by excessive heat conditions in Texas, especially given the open and obvious, well-known nature of South Texas's brutal summer heat. *Coones v. Cogburn*, No. 24-10777, 2025 WL 2092392, at *3 (5th Cir. Jul. 25, 2025) (per curiam) (citing *Hinojosa*, 807 F.3d at 667 ("[T]he open and obvious nature of the dangerously hot conditions would also support an inference of deliberate indifference.")).

Defendants maintain they took every step in their power to ensure that Plaintiff and all other inmates at the McConnell Unit had access to safe and effective heat-mitigation measures including full respite. (D.E. 84, p. 34). However, the "mere presence of remedial measures" is not

a sufficient defense as such measures "must adequately ensure prisoners do not experience excessive heat in violation of the Eighth Amendment. *Coones*, 2025 WL 2092392, at *3 (citing *Yates*, 868 F.3d at 360; *Blackmon v. Garza*, 484 F. App'x 866, 871 (5th Cir. 2012) (per curiam) (holding that despite remedial efforts by prison officials, inmates were still denied access to adequate cooling measures).

The evidence detailed above reveals key factual disputes as to whether Wardens Amonett, Holmes, and Sanchez took reasonable steps, in light of their knowledge of the excessive heat conditions, to put in place policies that adequately protected McConnell Unit inmates, especially G5 inmates like Plaintiff, from excessive heat conditions. Such factual disputes relate to decisions and policies by the senior wardens: (1) impacting Plaintiff's ability to access respite as a G5 inmate requiring a security staff escort; (2) the automatic placement of G5 inmates into small holding cells when receiving respite; (3) the lack of wellness checks for all inmates, including inmates like Plaintiff, on the Heat Restriction List; and (4) whether subordinate staff were charged with monitoring inmates for heat-related illnesses and assisting inmates to medical.

The Court is mindful of the statements made by Wardens Amonett, Holmes, and Sanchez that they were not responsible for staffing matters and that staffing issues were an issue at the McConnell Unit during the summer months of 2022 and 2023. Nevertheless, disputed factual issues as to the effectiveness of heat-related remedial measures exist during this time frame, especially in light of compelling evidence presented by Plaintiff that he received fewer remedial measures than set forth in AD-10.64. This TDCJ directive mandated unlimited respite when requested as well as wellness checks for inmates on the Heat Restriction List. The necessity for such remedial measures takes on added significance for Plaintiff. The objective medical evidence reflects that Plaintiff faced an increased susceptibility to the effects of excessive heat due to heat

stress factors caused by his hypertension, diabetes, and prescribed hypertension medication. (D.E. 86, p. 33, 60).

Accordingly, genuine issues of material fact exist as to whether Wardens Amonett, Holmes, and Sanchez (1) knew that Plaintiff faced a substantial risk of serious harm due to the excessive heat conditions present during the summers of 2022 and 2023; and (2) disregarded that risk by failing to take reasonable remedial measures to abate the risk to Plaintiff through their policies addressing the excessive heat conditions at the McConnell Unit. *See Valentine*, 993 F.3d at 281; *Hinojosa*, 807 F.3d at 669; *see also Coones*, 2025 WL 2092392, at *3 (citing the Fifth Circuit as "repeatedly recognizing that supervisory defendants' failure to provide adequate measures to remediate the Texas heat violates the Eighth Amendment"). These disputed factual issues preclude an entitlement to qualified immunity for Wardens Amonett, Holmes, and Sanchez under the first prong of the analysis with regard to Plaintiff's deliberate indifference claim against them in their individual capacities for putting into place or continuing policies (1) limiting wellness checks; (2) providing inadequate space for inmates like Plaintiff requesting air-conditioned respite; (3) inadequately staffing a sufficient number of escorts for Plaintiff to access respite upon request (4) placing G5 inmates like Plaintiff in a restrictive location (3 x 3-foot holding cell) for respite; and (5) denying access to respite for G5 inmates like Plaintiff.

The Court next turns to the second prong of the qualified immunity analysis—whether the actions of Wardens Amonett, Holmes, and Sanchez actions were objectively unreasonable under clearly established law. It is true, as discussed above, that general statements of legal principles not tethered "to analogous or near-analogous facts are not sufficient to establish a right clearly in a given context." *See Vincent*, 805 F.3d at 547 (internal quotations and citation omitted). The Fifth Circuit has recognized that the central concept in the qualified immunity context is "fair warning,"

in that "[q]ualified immunity should not be denied unless the law is clear in the more particularized sense that reasonable officers should be 'on notice that their conduct is unlawful.'" *Kinney v. Weaver*, 367 F.3d 337, 350 (5th Cir. 2004) (quoting *Saucier v. Katz*, 533 U.S. 194, 206 (2001)). "The law can be clearly established despite notable factual distinctions between the precedents relied on and the cases then before the Court, so long as the prior decisions gave reasonable warning that the conduct then at issue violated constitutional rights." *Ramirez v. Martinez*, 716 F.3d 369, 379 (5th Cir. 2013) (internal quotations and citations omitted).

Defendants contend that it was not 'beyond debate' in the summers of 2022 and 2023 that:

- "limiting an inmate's wellness checks and/or access to respite areas violated the Eighth Amendment, especially where the inmate had no documented heat-related sensitivities or illnesses, and the officials were doing everything in their power to provide all heat-mitigation measures"; and
- subjecting inmates to temporary respite in small holding cells violated the Eighth Amendment, especially where the inmate did not face a substantial risk of harm from the conditions in those holding cells; and

(D.E. 84, p. 30). Liberally construed, Plaintiff essentially responds that the law was clear at this time that he was subjected to a substantial risk of serious harm though the denial of respite and wellness checks on numerous occasions as well as placement in a small 3 x 3-foot holding cell—when he was able to get respite—on occasion without the ability to access the toilet or stay in respite for a sufficient amount of time. (D.E. 93, p. 61–68).

Binding precedent in the Fifth Circuit before the summers of 2022 and 2023 established generally that subjecting prisoners to excessive heat without providing adequate remedial measures violates the Eighth Amendment. *See Yates*, 868 F.3d at 359 ("It is well-established in [the Fifth Circuit] 'that the Eighth Amendment guarantees inmates a right to be free from exposure to extremely dangerous temperatures without adequate remedial measures.'") (quoting *Hinojosa*,

807 F.3d at 669). Fifth Circuit case law, however, is not so clearly settled regarding whether the specific heat mitigation measures afforded to Plaintiff at the McConnell Unit were inadequate in violation of the Eighth Amendment. Three Fifth Circuit cases are instructive on this issue.

In *Gates*, the Fifth Circuit upheld in 2004 a class-wide injunction based on Eighth Amendment violations, which required the Mississippi Department of Corrections to equip each cell with fans, provide inmates with access to ice water, and allow daily showers when the heat index reaches and exceeds 90 degrees. *Gates*, 376 F.3d at 339–40. The *Gates* decision provides an initial benchmark from the Fifth Circuit for determining what remedial measures are deemed adequate for addressing excessive heat conditions in a prison to avoid an Eighth Amendment deliberate indifference violation.

In contrast, the Fifth Circuit in *Blackmon* addressed an inmate's Eighth Amendment excessive heat claim where: (1) inmate Blackmon was confined in a non-air-conditioned prison dormitory with 53 other men and with only one industrial fan; (2) inmates were not allowed to use personal fans due to a lack of electric outlets; (3) the windows in the dorm were sealed; (4) Blackmon testified that a lack of iced water forced inmates to drink from sinks; and (5) Blackmon had to wait "roughly an hour" to use a shower when it was needed the most on a hot day because several showers were broken. *Blackmon*, 484 F. App'x at 871. The Fifth Circuit concluded that a reasonable jury could find "that the remedial measures adopted by prison officials were inadequate to combat the extreme [excessive heat] conditions in [Blackmon's prison] dorm and to address the salient health risks." *Id.* at 872. In the Court's view, the *Blackmon* decision issued in 2012 sets a benchmark as to what constitutes clearly inadequate remedial measures employed by prison officials to address excessive heat conditions.

Lastly, in *Ball*, the Fifth Circuit in 2015 affirmed Eighth Amendment violations where several Louisiana death-row inmates—who had medical conditions making them more susceptible to excessive heat—were housed in "very hot cells without sufficient access to heat-relief measures." *Ball*, 792 F.3d at 596. The Fifth Circuit reached this decision even though the inmates had access to potable water and ice. *Id.* at 590. The *Ball* court rejected the State's argument that there could be no Eight Amendment violation where the remedial measures mandated in *Gates* were provided to the inmates. *Id.* at 592. While not overturning or modifying *Gates* on this issue, the *Ball* court explained that the remedial measures sanctioned in *Gates* were distinguishable in the following ways from those remedial measures provided to the death row inmates in *Ball*: (1) each fan in the Louisiana's death row served two cells in an inadequate manner; (2) the death row inmates in *Ball* only had "unfettered access to ice during the one hour a day they can walk the tiers"; and (3) while *Gates* approved of prisoners using showers once a day, the documented water temperatures for the showers used by the death row inmates were between 100 and 120 degrees. *Id.* at 595–96.

Here, as discussed above, Plaintiff has presented considerable evidence to indicate he was denied certain heat-mitigation measures involving access respite on several occasions and was receiving limited wellness checks. However, AD-10.64 requires other heat-mitigation measures to be available to inmates, such as drinking water and cups for every offender during periods of excessive heat. (D.E. 84-5, p. 5). AD-10.64 also mandates the following heat-mitigation measures and precautions when the heat index exceeded 90 degrees, including, but not limited to:

- Providing additional water and cups in offender dorms, housing areas, recreational areas, and during mealtimes, along with ice;
- Transporting offenders during the coolest hours of the day when possible;

- Allowing offenders to utilize and carry cooling towels;
- Allowing offenders to wear shorts and t-shirts in the dayrooms and recreational areas;
- Allowing additional showers for offenders when possible;
- Lowering the water temperature for single temperature showers in offender housing areas; and
- Allowing fans for offenders in all custody levels, to include restrictive housing and disciplinary status, and ensuring the fan program is in place allowing the permanent issuance of fans to indigent offenders.

*Id.* at 8–9.

Wardens Wysocki, Amonett, Holmes, and Sanchez uniformly state that "[w]hile waiting for respite, inmates always have access to cold water and other heat-mitigation measures outlined in AD-10.64." (D.E. 84-1, p. 3); (D.E. 84-2, p. 3); (D.E. 84-3, p. 3); (D.E. 84-4, p. 4). Other than citing the occasions he was denied respite or was not receiving wellness checks, Plaintiff points to no competent summary judgment evidence to indicate that these other heat-mitigation measures mandated by AD-10.64 were not made available to him.[11] In fact, he acknowledges that—at least during the summer of 2022 when he was denied access to respite in an air-conditioned environment, he was provided with access to showers one to three times per week and was getting cold water. (D.E. 10, p. 17).

The undisputed evidence in this case shows that heat-mitigation measures commensurate with those measures mandated in *Gates* were available to Plaintiff during the summers of 2022 and 2023. Neither *Gates*, *Blackmon*, nor *Ball* considered whether an inmate's Eighth Amendment

[11] While listing several dates when he was denied access to air-conditioned respite during the summers of 2022 and 2023, Plaintiff does not specify instances where he was denied access to cold showers or ice water during the same time period. *See* (D.E. 10-1).

rights were violated where the *Gates*-mandated measures were provided while measures such as periodic access to respite and/or daily wellness checks were denied. The Court has not found and Plaintiff does not cite to any controlling decision or a "robust consensus" of persuasive authority to place to place this particular deliberate indifference claim at issue "beyond debate."[12] *Ashcroft*, 563 U.S. at 741. Plaintiff fails to cite or otherwise point to any clearly established law providing clear notice to Wardens Amonett, Holmes, and Sanchez (or, likewise, a reasonable official in their positions) that actions taken to deny respite or limit wellness checks constituted deliberate indifference in violation of Plaintiff's Eighth Amendment rights where other adequate heat mitigation measures, such as those mandated in *Gates*, were present.

As part of his Eighth Amendment claims, Plaintiff next asserts that his placement in the 3 x 3-foot holding cells put him at a substantial risk of injury due to his diabetes, physical impairments, and denial of access to urinate in a restroom. Plaintiff states that:

- he was forced to stay in respite on numerous occasions for several hours in a 3 x 3-foot holding cell which lacked access to a toilet to accommodate his diabetes' condition and caused him to urinate inside the cage into a water bottle;

[12] It is true that the district court in *Tiede* determined that, based on the evidence submitted in connection with a motion for preliminary injunction, inmates in non-air-conditioned cells faced a substantial risk of severe bodily harm even where TDCJ implemented all of TDCJ's heat mitigation measures, including "access to cooled respite areas, distribution of water and ice, cool showers, and fans." *Tiede*, 796 F. Supp.3d at 326–27. However, because this decision was issued on March 26, 2025—well after the events of this lawsuit in 2022 and 2023—*Tiede* cannot be cited as authority, much less a "robust consensus" of persuasive authority, to place this Eighth Amendment deliberate indifference claim "beyond debate" at the time of the challenged conduct. *See Ford*, 102 F.4th at 307. The Court also recognizes the Fifth Circuit's decision in *Coones*, which reversed the lower court's dismissal of a similar Eighth Amendment claim based on TDCJ's policy to provide fans, ice water, and daily showers. *Coones*, 2025 WL 2092392, at *3. The *Coones* court opined that "the mere presence of remedial measures is not a sufficient defense—remedial measures must adequately ensure prisoners do not experience excessive heat in violation of the Eighth Amendment." *Id.* Again, this case was decided well after the events of this lawsuit and, therefore, cannot serve as binding or persuasive authority to place Plaintiff's Eighth Amendment deliberate indifference claim "beyond debate" at the time of the challenged conduct. *See Ford*, 102 F.4th at 307.

- he had no way to elevate or lengthen his left leg while placed in the small holding cells;
- he was subjected to human waste inside of the cage during his periods of respite in the holding cells; and
- his requests to be moved to a cell with a working toilet were denied.

(D.E. 10, p. 10, 12; D.E. 93, p. 67). Plaintiff explains further that his diabetic condition caused excessive thirst, and that no official was available to provide him water while he was confined in the 3 x 3-foot holding cell. *Id.* As opposed to claiming that excessive heat posed a substantial risk to his health while in air-conditioned respite in a small holding cell, this aspect of Plaintiff's Eighth Amendment claims focuses on Plaintiff being subject to a substantial risk of harm due to the impact of his placement on his diabetes and other physical issues.

Plaintiff cites to several cases as either binding precedent or a "robust consensus" of persuasive authority to establish that the actions of Wardens Amonett, Holmes, and Sanchez (and reasonable prison officials in their positions) in placing him in 3 x 3-foot holding cells violated his Eighth Amendment rights. (D.E. 93, p. 65-67). In one of these cases, the Fifth Circuit held that the deprivation of basic hygiene, including access to a toilet, may violate the Constitution to the extent that the condition is inhumane and barbaric. *See Palmer v. Johnson*, 193 F.3d 346, 352–53 (5th Cir. 1999) (determining that an Eighth Amendment violation is present where an inmate was denied a sanitary way to relieve himself for seventeen hours).

In *Quintanilla v. Araiza*, No. SA-20-CV-00927, 2021 WL 2019204 (W.D. Tex. May 20, 2021) (Rodriguez, J.), another case cited by Plaintiff, the Court recognized "the general constitutional rule that an inmate should not be made to endure degrading situations[,]" related to the denial of access to a toilet. *Id.* at *9. The facts of *Quintanilla* reflect that the inmate was strapped to a restraining chair for at least three hours, that his requests to use the restroom were

effectively denied, and that he was forced to urinate and defecate on himself. *Id.* Under these conditions, the court denied defendants' motion to dismiss the inmate's deliberate indifference claim on qualified immunity grounds. *Id.*

Lastly, Plaintiff cites to a decision entered in this district, *Guzman v. Fuentez*, No. 2:18-CV-00432, 2019 WL 6975764 (S.D. Tex. Dec. 19, 2019) (Tagle, J.). In *Guzman*, District Judge Hilda Tagle concluded that "[d]efecation and urination are basic human needs" such that "[t]he deprivation of a place to defecate or urinate so that a person i[s] forced to defecate or urinate on themselves amounts to a deprivation of a 'minimal civilized measure of life's necessities.'" *Id.* at *4 (citing *Wilson v. Seiter*, 501 U.S. 294, 298 (1991) and *Hope v. Pelzer*, 536 U.S. 730, 738 (2002)).

*Palmer* does not place the constitutional question beyond debate with regard to Plaintiff's short-term periodic placements in a small holding cell. Here, Wardens Amonett, Holmes, and Sanchez each affirm that Plaintiff was placed in respite in a 3 x 3-foot holding cell or 6 x 5-foot legal booth only for short periods of time. (D.E. 84-2, p. 2); (D.E. 84-3, p. 2); (D.E. 84-4, p. 2). While Plaintiff generally characterizes the length of time spent in the small holding cell as being "several hours" each time, such length of time falls well short of the 17-hour amount of time the inmate in *Palmer* went without the ability to relieve himself.

The facts presented in both *Quintanilla* and *Guzman* present more extreme situations by describing incidents where the inmate was forced to both urinate and defecate while being either restrained or placed in a smaller cell area. Plaintiff's statements, in contrast, fall short of demonstrating that he was forced to both defecate and urinate on himself during his periodic and relatively short stints in the small holding cells for respite. As such, the Court finds no robust

consensus of authority finding Eighth Amendment deliberate indifference violations in scenarios similar to the one at issue in this case.

Furthermore, the deliberate indifference claims retained in this case against Wardens Amonett, Holmes, and Sanchez center on whether Plaintiff faced a substantial risk of serious harm by being placed in a 3 x 3-foot holding cell for hours at a time and whether these defendants had the requisite knowledge of such exposure and failed to take any remedial actions. Plaintiff has not cited any case law establishing an Eighth Amendment violation when an inmate with diabetes and/or similar physical limitations was placed in an environment restricting movement and denied access to a restroom while at the same time receiving relief from other onerous conditions like excessive heat. *See Harmon*, 16 F.4th at 1166 (explaining that the controlling decision or consensus must be with regard to the official's "*particular* conduct," described with specificity) (quoting *Mullenix*, 577 U.S. at 12).

Plaintiff, therefore, has failed to satisfy his burden and present existing precedent to place these particular deliberate indifference claims at issue "beyond debate." *Ashcroft*, 563 U.S. at 741. Plaintiff fails to cite or otherwise point to any clearly established law providing clear notice to Wardens Amonett, Holmes, and Sanchez (or, likewise, a reasonable official in their positions) that actions taken to place Plaintiff in respite in a small 3 x 3-foot holding cell constituted deliberate indifference in violation of his Eighth Amendment rights.

In sum, Plaintiff cannot satisfy the second prong of the qualified immunity analysis as to whether Wardens Amonett, Holmes, and Sanchez actions were objectively unreasonable under clearly established law. The Court concludes, therefore, that Wardens Amonett, Holmes, and Sanchez in their individual capacities are entitled to qualified immunity and summary judgment as to Plaintiff's: (1) Eighth Amendment deliberate indifference claims challenging their actions in

failing to put in place and continue policies for remedial measures to protect Plaintiff adequately from the excessive heat conditions; and (2) Eighth Amendment deliberate indifference claims challenging his placement in 3 x 3-foot holding cells for respite.

b. Plaintiff's Claim against Dr. Kwarteng

The test for deliberate indifference in the context of medical care has the same objective and subjective prongs detailed above. *See Farmer*, 511 U.S. at 839; *Valentine*, 993 F.3d at 281; *see also Estate of Bonilla v. Orange Cnty., Tex.*, 982 F.3d 298, 305 (5th Cir. 2020) ("To prove deliberate indifference, the Plaintiffs must show that the defendants were aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, that the defendants actually drew the inference, and that the defendants disregarded that risk by failing to take reasonable measures to abate it." (citation modified)). Deliberate indifference may be exhibited by prison doctors or nurses in their response to prisoners' medical needs. *Estelle v. Gamble*, 429 U.S 97, 104–05 (1976).

In the context of medical treatment, the prisoner must show "that prison officials refused to treat him, ignored his complaints, intentionally treated him incorrectly, or engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical needs." *Gobert v. Caldwell*, 463 F.3d 339, 346 (5th Cir. 2006) (citation modified). In addition to establishing the objective and subjective prongs, an inmate "must prove that the delay or denial of medical treatment resulted in substantial harm, such as additional pain." *Petzold v. Rostollan*, 946 F.3d 242, 249 (5th Cir. 2019) (citation modified); *see also Estelle*, 429 U.S. at 103 (explaining that the "denial of medical care may result in pain and suffering which no one suggests would serve any penological purpose").

As discussed above, the Fifth Circuit has "consistently recognized . . . that 'deliberate indifference cannot be inferred merely from a negligent or even a grossly negligent response to a substantial risk of serious harm.'" *Dyer*, 964 F.3d at 381 (quoting *Thompson*, 245 F.3d at 459). Deliberate indifference encompasses only unnecessary and wanton infliction of pain repugnant to the conscience of mankind. *McCormick*, 105 F.3d at 1061 (citations omitted).

The Court has retained Plaintiff's Eighth Amendment deliberate indifference claim against Dr. Kwarteng in his individual capacity based on his awareness of Plaintiff's heat-related medical issues from June 2022 through August 2022 and failure to attend to Plaintiff's medical needs. (D.E. 16, p. 71–72); (D.E. 46, p. 1–3). In their summary judgment motion, Defendants contend that Plaintiff's deliberate indifference claim against Dr. Kwarteng fails because (1) Plaintiff never exhibited any signs of excessive heat stress and was never diagnosed with a heat-related illness; (2) to the extent that Plaintiff suffered a heat-related illness, Dr. Kwarteng did not cause those injuries in that he could not have taken any action to prevent them; and (3) Dr. Kwarteng had no authority over Plaintiff's movement in the unit, his housing classification, and his access to water and respite. (D.E. 84, p. 22). Defendants contend further that Dr. Kwarteng's various written responses to Plaintiff's SCRs in the summer of 2022 do not constitute deliberate indifference because he already had access to Plaintiff's medical records and was aware of Plaintiff being examined and treated by other medical staff. *Id.* at 27. Defendants contend that, at most, Plaintiff's complaints about Dr. Kwarteng's actions amount to a mere disagreement with his treatment, which does not amount to an Eighth Amendment violation. *Id.* at 28.

Plaintiff responds that Dr. Kwarteng acted with deliberate indifference by failing to prescribe any medications to address Plaintiff's heat-related illnesses and instead only recommending respite. (D.E. 93, p. 54). Plaintiff contends further that Dr. Kwarteng knew (1)

Plaintiff was suffering with heat-related symptoms via his SCRs; (2) placing Plaintiff in an air-conditioned environment would ameliorate those symptoms; (3) respite, and not medications, would resolve Plaintiff's complaints; (4) Plaintiff was entitled to respite and was not getting respite; (5) he had the authority to take steps to enforce any medical restrictions or passes by raising the issue with his bosses; and (6) the warden in charge would not have denied his request to have Plaintiff taken to an air-conditioned environment. *Id.* at 55. Lastly, Plaintiff contends that, based on the fact he was seen by nursing staff and not a provider in a clinical setting, Dr. Kwarteng intentionally treated Plaintiff incorrectly. *Id.* at 56.

The objective medical records show that, while he did not examine or treat Plaintiff in person during the summer of 2022, Dr. Kwarteng reviewed and responded to several of Plaintiff's SCRs between June 6 and August 2, 2022. Dr. Kwarteng's written responses are as follows:

- June 6, 2022: "You have been assigned appropriate medical restrictions." (D.E. 86, pp. 634-35). Additional medical records show that Plaintiff's medical restrictions at that time consisted of: (1) lower bunk, ground floor housing; (2) sedentary work only; (3) no climbing; (4) no work in direct sunlight; (5) no temperature extremes; (6) no humidity extremes; and (7) no work around machines with moving parts. *Id.* at 18, 42–43, 231–33.

- June 23, 2022: "You have all the medical restrictions based on your medical and other conditions. The medical department does not assign inmates to special housing areas." (D.E. 86, p. 43); (D.E. 86-1, p. 32).

- July 6, 2022: "You have all the heat restrictions. You can always ask for respite." (D.E. 86, p. 23, 43).

- July 14, 2022: "Medical Dept[.] does not control respite. Please direct your concerns to TDCJ." (D.E. 86-1, p. 98).

- August 2, 2022: "1. You have heat restrictions[.] 2. You can also ask to be taken out for respite[.] 3. Stay hydrated." *Id.* at 151.

The objective medical records further show that Plaintiff submitted numerous SCRs between June 2022 and August 2022 seeking medical attention and treatment to alleviate his heat-

related symptoms. (D.E. 86, p. 17–25, 43, 622, 630, 634–35, 640–42, 656); (D.E. 86-1, p. 15, 22, 30–33, 47–48, 82, 90, 97–98, 107, 151). These records reflect that, while he was not examined in person by Dr. Kwarteng, Plaintiff was seen on many occasions by McConnell Unit nursing staff immediately in response to his SCRs during this time period. Each time he was evaluated by medical staff, clinical notes reflect the following: (1) Plaintiff denied having heat-related symptoms at the time of the evaluation; (2) Plaintiff's vital signs were within normal limits; (3) Plaintiff walked with a strong and steady gait; (4) Plaintiff was in no acute distress; and (5) Plaintiff's respirations were equal and unlabored. (D.E. 86, p. 17–25, 624, 630, 644, 647); (D.E. 86-1, p. 3, 15, 24, 35, 82, 105). Dr. Adams, Defendants' expert, opined that Plaintiff had denied heat-related symptoms during the times he was examined in medical or cell-side in his housing area and did not exhibit signs of heat-related illness. (D.E. 86, p. 34). None of the medical records during the summer of 2022 show that Plaintiff lost the ability to thermoregulate or otherwise suffered heat-related symptoms exhibiting either serious heat cramps, heat exhaustion, or heat stroke. *Id.* at 35–36; (D.E. 86-1, p. 399).

The competent summary judgment evidence further shows that the medical department, including Dr. Kwarteng, did not have the authority over security issues related to respite or "to determine custody levels or the location of respite areas." (D.E. 86, p. 46); (D.E. 93-15, p. 7). The competent summary judgment evidence further demonstrates that (1) there were no known medications to prescribe Plaintiff during an excessive heat period; (2) the prevention and treatment for any heat-related illness instead involves the reduction of activity, cooling the body, and replacing lost fluids through hydration; and (3) while Plaintiff's prescribed medication (amlodipine) for hypertension is considered a potential risk factor for heat illness, it is a safer medication in excessive heat conditions than other hypertension drugs like diuretics (may cause

dehydration and electrolyte imbalances) or beta blockers (may reduce cardiac output and hinder the ability to sweat efficiently). (D.E. 86, p. 47); (D.E. 86-1, p. 534).

Generally, "a court should not make credibility determinations or weigh the evidence in ruling on a motion for summary judgment." *Chacon v. Copeland*, 577 F. App'x 355, 360 (5th Cir. 2014) (per curiam) (citation modified). However, the Fifth Circuit Court of Appeals recognizes that "'[m]edical records of sick calls, examinations, diagnoses, and medications may rebut an inmate's allegations of deliberate indifference.'" *Parrish v. Berry*, 789 F. App'x 476, 476–77 (5th Cir. 2020) (quoting *Banuelos v. McFarland*, 41 F.3d 232, 235 (5th Cir. 1995)).[13]

Overall, the objective medical evidence presented rebuts any assertion by Plaintiff that Dr. Kwarteng refused to treat Plaintiff's heat-related issues from June through August 2022, ignored his complaints altogether, intentionally treated him incorrectly, or engaged in conduct evincing a wanton disregard for these issues. *Gobert*, 463 F.3d at 346; *Baneulos*, 41 F.3d at 235; *see also Turner v. Moffett*, No. 3:12-CV-220, 2013 WL 5214070, at *3 (S.D. Tex. Sep. 17, 2013) (Costa,

[13] Plaintiff asserts that the Courts must accept his allegations as true even if they conflict with authenticated records produced by the TDCJ. (D.E. 93, p. 21). Citing several cases, Plaintiff contends that the Court cannot use the objective medical records submitted by Defendants to resolve material factual disputes when they conflict with Plaintiff's pleadings or statements made in affidavits. *Id.* Each of the cases cited by Plaintiff are inapposite as they each discuss how to treat Plaintiff's allegations at the screening, or pleading, stage and not on summary judgment. *Cf. Williams v. Luna*, 909 F.2d 121, 124 (5th Cir. 1990) (explaining that, in the context of considering whether to dismiss claims as frivolous, the use of prison records to counter a plaintiff's *Spears* hearing testimony is improper); *Vaughn v. Bassett*, No. 22-10962, 2024 WL 2891897, at *5 (5th Cir. Jun. 10, 2024) (per curiam) (explaining that, in the context of considering whether to dismiss claims as frivolous or for failure to state a claim for relief, the district court commits error by failing to treat the plaintiff's allegations as true and instead credit authenticated records even when the records conflict with the pleadings); *Cardona v. Taylor*, 828 F. App'x 198, 201 (5th Cir. 2020) (per curiam) (explaining that, in the context of considering whether to dismiss claims for failure to state a claim for relief, "information from a *Martinez* report may not be used to resolve material disputed facts when the information conflicts with the plaintiff's pleadings"); *Newby v. Quarterman*, 325 F. App'x 345, 354 (5th Cir. 2009) (explaining that, in the context of considering whether to dismiss claims as frivolous or for failure to state a claim for relief, "[a] *Martinez* report may not be used to resolve material disputed fact findings when they are in conflict with the pleadings or affidavits").

J.) (recognizing that the court may find allegations to be implausible when contradicted by the objective medical evidence); *Alexander v. Dickerson*, No. 6:08cv404, 2009 WL 2244139, at *9 (E.D. Tex. Jul. 27, 2009) (Gutrhie, Mag. J.) (concluding that conclusory allegations or unsubstantiated assertions cannot defeat a summary judgment motion). In responding several times to Plaintiff's SCRs during the relevant time period, Dr. Kwarteng confirmed Plaintiff's heat-related medical restrictions, urged him to seek respite when overheated, and counseled him to stay hydrated. Dr. Kwarteng's written responses were in addition to the numerous times Plaintiff was seen by medical staff at the McConnell Unit for heat-related complaints during this time period. Dr. Kwarteng further communicated to Plaintiff that he was not aware of any medications to prescribe to him during excessive heat hours. (D.E. 86-1, p. 534). Plaintiff has come forward with no evidence to show that such a drug was available or that Dr. Kwarteng intentionally withheld such a beneficial medication for treating heat-related symptoms.

The evidence demonstrates, at best, Plaintiff's dissatisfaction with the medical care provided him by Dr. Kwarteng and the McConnell Unit medical staff for his heat-related complaints. *See Whiting v. Kelly*, 255 F. App'x 896, 899 (5th Cir. 2007) (per curiam) ("Although [plaintiffs] clearly believe that they should undergo additional testing and drug therapies, such disagreement does not give rise to a constitutional claim." (citations omitted)). While Plaintiff was undoubtedly frustrated with the medical care provided to him by Dr. Kwarteng and his medical staff, his disagreement with the overall medical attention and unhappiness with Dr. Kwarteng is insufficient to establish a § 1983 claim. *See, e.g.*, *Davis v. Lumpkin*, 35 F.4th 958, 963 (5th Cir. 2022) (explaining that "[m]ere disagreement with medical judgments or treatment is" insufficient to demonstrate an Eighth Amendment claim of deliberate indifference).

Accordingly, even when viewing the competent summary judgment in a light most favorable to Plaintiff, no genuine issues of material fact exist as to whether Dr. Kwarteng acted with the requisite deliberate indifference to Plaintiff's heat-related complaints from June through August 2022. Because Plaintiff has failed to show deliberate indifference with respect to Dr. Kwarteng, it is unnecessary to examine whether his actions were objectively reasonable. *See Pearson*, 555 U.S. at 236; *Cleveland v. Bell*, 938 F.3d at 676. Dr. Kwarteng, therefore, is entitled to summary judgment and qualified immunity because Plaintiff cannot state an Eighth Amendment deliberate indifference claim against him.

## VI. Conclusion

Pursuant to Federal Rule of Civil Procedure 25(d), **IT IS ORDERED** that:

- Warden Larissa Wysocky is **SUBSTITUTED** for Warden Adrian Amonett with respect to Plaintiff's ADA and RA claims asserted against this defendant in her official capacity;
- Director Eric Guerrero is **SUBSTITUTED** for Director Bobby Lumpkin with respect to Plaintiff's ADA and RA claims asserted against this defendant in his official capacity; and
- Executive Director Lumpkin is **SUBSTITUTED** for Executive Director Bryan Collier with respect to Plaintiff's ADA and RA claims asserted against this defendant in his official capacity.

For the reasons set forth above, Defendants' Motion for Summary Judgment, (D.E. 84) is **GRANTED in its entirety** as follows:

- Defendants summary judgment motion on mootness grounds, (D.E. 84), is **GRANTED** as to Plaintiff's ADA and RA claims against the State of Texas, Warden Wysocki, Dr. Isaac Kwarteng, Director Guerrero, and Executive Director Lumpkin in their official capacities for injunctive relief. These claims are **DISMISSED without prejudice** for lack of subject matter jurisdiction.
- Defendants' summary judgment motion, (D.E. 84), is **GRANTED** as to Plaintiff's Eighth Amendment deliberate indifference claim against Dr. Kwarteng in his

individual capacity because he is entitled to qualified immunity as to this claim. This claim against Dr. Kwarteng is **DISMISSED with prejudice**.

- Defendants' summary judgment motion, (D.E. 84), is **GRANTED** as to Plaintiff's Eighth Amendment deliberate indifference claims against Wardens Amonett, Holmes, and Sanchez in their individual capacities (for putting into place or continuing policies: (1) limiting wellness checks; (2) providing inadequate space for inmates like Plaintiff requesting air-conditioned respite; (3) inadequately staffing a sufficient number of escorts for Plaintiff to access respite upon request; and(4) denying respite for G5 inmates like Plaintiff altogether) because they are entitled to qualified immunity as to these claims. These claims against Wardens Amonett, Holmes, and Sanchez are **DISMISSED with prejudice**

- Defendants' summary judgment motion, (D.E. 84), is **GRANTED** as to Plaintiff's Eighth Amendment deliberate indifference claims against Wardens Amonett, Holmes, and Sanchez in their individual capacities (for placing him in restrictive 3 x 3-foot holding cells for respite) because they are entitled to qualified immunity as to these claims. These claims against Wardens Amonett, Holmes, and Sanchez are **DISMISSED with prejudice.**

Finally, in light of the above rulings, the Court **DENIES** Plaintiff's Motion for Summary Judgment in its entirety, (D.E. 93), **DENIES as moot** Plaintiff's renewed motion for a TRO or other preliminary injunctive relief, (D.E. 106), and **DENIES as moot** Plaintiff's motion to vacate, (D.E. 110).

The Court will enter final judgment separately.

SO ORDERED.

DAVID S. MORALES
UNITED STATES DISTRICT JUDGE

Signed: Corpus Christi, Texas
August 14th, 2026